JUDGE HELLERSTEIN

14 CV                    232

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAUL WOEBEL, Individually and on Behalf of All Other Persons Similarly Situated, )))) | Civil Action No.: |
| Plaintiff, )))) | **JURY TRIAL DEMANDED** |
| v. )))) | |
| INTL FCSTONE INC. f/k/a INTERNATIONAL ASSETS HOLDING CORPORATION, SEAN M. O'CONNOR, and WILLIAM J. DUNAWAY, )))))) | |
| Defendants. )) | |



## CLASS ACTION COMPLAINT

Plaintiff Paul Woebel ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding INTL FCStone, Inc. f/k/a International Assets Holding Corporation ("INTL FCStone" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased INTL FCStone securities between February 17, 2010 and December 16, 2013, inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 against the Company and certain of its top officials.

2.      INTL FCStone is a financial services holding company. The Company and its subsidiaries offer a broad spectrum of financial services to its customers throughout the world, including execution and advisory services in commodities, currencies, and international securities.

3.      The Company, in its current form, was created through a series of mergers and acquisitions of various smaller financial services firms, culminating in the merger of International Assets Holding Corporation ("International Assets") and FCStone Group, Inc. ("FCStone"), two publicly traded entities, around September 2009, to create INTL FCStone (the "FCStone Merger").

4.      In July 2010, the Company completed an acquisition of the Hanley Capital Group ("Hanley"). Hanley, a market maker in exchange-traded agricultural options, provides complex over-the-counter (OTC) structured products for commercial users. Hanley was integrated into the existing OTC trade desk of FCStone Group, a wholly owned subsidiary of INTL, to create an entity known as INTL FCStone Markets LLC ("FCStone Markets").

5.      FCStone Markets principally provides commodity trading services and risk management ("Commodity and Risk Management") for customers in the OTC commodities

markets, such as facilitating hedging transactions to limit a manufacturer's exposure to pricing risk in the grain or metals market. Commodity and Risk Management is the Company's largest reporting segment.   In INTL FCStone's most recent annual report, the segment reported operating revenues of $246 million, approximately 55% of the Company's net revenues, and net income of $69.7 million.

6.     According to the Company's Form S-4 Registration Statement filed with the SEC in August 2009, the FCStone Merger would create a consulting and trade execution platform, "well positioned to achieve strong financial performance and increase stockholder value by adhering closely to our customer-centric strategies."

7.     Indeed, Defendant Sean O'Connor, at the time the CEO of International Assets, declared in an investor conference call held on August 6, 2009 that:

> International Assets and FCStone approach business the same way. We have tried to avoid the high volume, low margin commoditized activities which we believe are right for the bottom margin-wise and not with the long-term future of International Assets life.

> Both entities focus on the mid-market commercial customers who require a high touch, value added execution service, some customization as a result of lack of sophistication and capital to support these activities. We believe this old fashion relationship approach in this sector of the market, if executed correctly, will allow us to earn attractive margin for a long time.

> ***

> We believe that this is a transformational transaction for both entities and comes at a time where we can make a major impact and dramatically accelerate our longer term plans.

8.     Similarly, representations regarding the success of the mergers were made by Defendants throughout the Class Period.   For example, in a conference call held with analysts in on February 10, 2011, Defendant O'Conner stated:

> we have now assembled all the capabilities to provide our target customers who are largely mid-sized corporations, with a comprehensive range of risk management, treasury and investment banking services. We have achieved some early meaningful successes that have validated the strategy, but we believe that we are still in the early stages of reaping the full benefits from the acquisitions we have made over the last 18 months.

9.     Despite such positive statements regarding the benefits of the merger, however, the Company failed to disclose that there were critical deficiencies with respect to the accounting practices, reporting standards, and business practices of its key operating segment, Commodity and Risk Management.

10.    Significantly, on February 9, 2012, the Company held a conference call with investors to discuss its first quarter 2012 performance.  The Company reported revenues $20 million lower than the same period for the prior year.   During the conference call, the Company discussed various critical issues such as slowing revenue streams, falling volume in the commodities market, and overall lack of a clear and compelling business model. Importantly, as highlighted by the Company and analysts' comments during the call, these issues arose principally as a result of "legacy" problems with FCStone's business and problems with integrating the merged INTL FCStone entities. For instance, Defendant O'Connor provided the following response to an analyst's question:

> Analyst: Okay, great. And then the last question. How are the conditions in the current quarter? I mean, have you seen anything change, or is it still everyone sort of sitting on their hands and volatility is down? **Especially in terms of the soft commodities, the legacy FCStone business**?
>
> Defendant O'Connor: Yeah, it's, you know, honestly, it's tough because we watch sort of our numbers day-to-day. So if we have a good day and you ask me that question, I'm much more optimistic. If I just step back a little bit, I would say January was probably sort of more of the same, frankly. Maybe mildly better. And certainly February seems to be slowly sort of picking up speed, so it's too early to call yet. But it's a tough environment and people are still pretty nervous about what happened with

MF. I think there is less volatility in the market and less inducement for people to do things. And on the Ag side of the business, we found that a lot of people have just sat on the harvest, they haven't delivered the harvest in, and that's a big part of our business.

And this happened to us two years ago. **Just straight off to the merger with FCStone, you know, we had sort of revenues that should have come in Q1 that didn't. And some of those revenues will be pushed out into Q2 and Q3. So some of it's a little bit of a timing issue**, some of it is general market conditions, but none of those factors are in our favor right now.

[Emphasis added.]

11.     The Company also responded to criticism from analysts and investors that it's "middle market, high touch" strategy was in fact an awkward and inefficient business model.

12.     On this news, the Company's shares fell $3.94 per share, or 14%, to close on February 9, 2012 at $22.54 per share.

13.     Moreover, the Company has been the subject of government investigations into its trading and accounting practices. As reported in the Company's annual report for the period ending September 30, 2012, and filed with the SEC on Form-10K on December 12, 2012, on November 2011, the Commodity Futures Trading Commission ("CFTC") Division of Enforcement Staff ("Staff") requested the Company to voluntarily produce specified documents to the Staff in connection with its then informal investigation of the losses that occurred in 2008 in the customer energy trading account of FCStone, LLC. In September 2012, the Staff provided the Company with a Wells notice, indicating the Staff's intention to recommend that the CFTC bring certain charges against FCStone, LLC. The Company filed its Wells Submission with the Staff in October 2012. As a result of this disclosure, the Company's shares fell $.30 per share to $17.88, or 1.6%.

14.     On December 17, 2013, the Company disclosed that it will not be able to file its Form 10-K for the fiscal year ended September 30, 2013, due to a review to evaluate the need to restate its financial results for its 2011, 2012 and 2013 fiscal years as a result of an overstatement of trading gains discovered in the reconciliation of FCStone Markets. The restatement will reduce previously reported trading gains by up to $10.2 million and consolidated net income by approximately $6.4 million. According to the Company, "The time frame for completing this review is not currently known and no assurances can be given that the Company will be successful in completing the filing of the Annual Report on Form 10-K for the fiscal years ended September 30, 2013 by December 31, 2013."

15.     On this news, INTL FCStone securities declined $1.62 per share or nearly 8%, to close at $18.93 per share on December 17, 2013.

16.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) there existed critical integration issues with the FCStone Merger, including with respect to financial reporting for its Commodity and Risk Management unit; (2) the Company overstated revenues in trading gains of up to $10.2 million, causing an overstatement of net income by approximately $6.4 million; (3) the Company lacked adequate internal and financial controls; and, (4) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

17.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

6

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

19.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

20.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b) as the securities of INTL FCStone were publicly traded in this District.

21.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

22.     Plaintiff, as set forth in the attached certification, purchased INTL FCStone securities at artificially inflated prices during the Class Period and has been damaged upon the revelation of the alleged corrective disclosures.

23.     Defendant INTL FCStone is a Delaware corporation with its headquarters located at 708 Third Avenue, New York, New York 10017.   The common stock is traded on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "INTL."

24.     Defendant Sean M. O'Connor ("O'Connor") has served at all relevant times as the Company's Chief Executive Officer.

7

25.     Defendant William J. Dunaway ("Dunaway") has served at all relevant times as the Company's Chief Financial Officer.

26.     The defendants referenced above in ¶¶ 24 - 25 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

27.     INTL FCStone is a financial services group employing more than 1,000 people in offices in twelve countries. The Company provides comprehensive risk management advisory services to mid-sized commercial customers. The Company also utilizes its expertise and capital to provide foreign exchange and treasury services, securities execution, physical commodities trading services and execution in both listed futures and option contracts as well as structured over-the-counter ("OTC") products in a wide range of commodities.

### Materially False and Misleading
### Statements Issued During the Class Period

28.     On February 16, 2010, after the market closed, the Company issued a press release announcing its financial results for the quarter ended December 31, 2009.  For the quarter, the Company reported a net loss of $4.2 million, or ($0.25) diluted earnings per share ("EPS") and total operating revenues of $59.6 million, compared to net income of $3.3 million or $0.35 diluted EPS and total operating revenues of $28.4 million for the same period a year ago.

29.     On February 17, 2010, the Company filed a quarterly report for the period ended December 31, 2009 on a Form 10-Q with the SEC signed by Defendants O'Connor and Dunaway, and reiterated the Company's previously reported financial results and financial position.  The Company also reported Commodity and Risk Management segment revenues of $23.4 million or 40% of net revenues, and segment operating income of $10.7 million. In

8

addition, the Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants O'Connor and Dunaway, stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

30.    That same day, the Company held a conference call to discuss the first quarter 2010 results.    During the conference call, Defendants' touted the benefits of the FCStone Merger:

> [W]e're feeling increasingly good about our longer-term story as we learn more about the opportunities presented by the combination with FCStone. That story, as mentioned last time, will play out over time, but even with the difficult market conditions we're dealing with presently, I do continue to believe that we'll make a satisfactory return on capital for the overall year.
>
> ***
>
> Turning to the FCStone merger integration, we have been hard at work integrating the companies quickly and with minimal disruption. The complementary nature of the merger has made this easier and I believe we are largely through the initial stage of this process. A high priority was to ensure our sales force was integrated and energized to offer a wider menu of products to existing and new customers.
>
> Recently we held our first company-wide meeting for all brokers, traders and consultants since the merger. We believe this is very positive. The combined sales force is now getting down to the work of driving revenues as they understand the power of the combination of the INTL and FCStone platforms. We have already seen some early successes, having cross-sold INTL's Forex and capital market services into the FCStone customers.
>
> We look forward to leveraging our expertise and breadth of service to further expand our engagement with customers as we move forward. We've also made some real progress on integrating and upgrading the accounting and perhaps more importantly the risk processes. On the accounting side, the [ ] team did very well and we have consolidated all the accounting onto one system and the accounting team is now fully integrated.

31.     On May 13, 2010, the Company issued a press release announcing its financial results for the quarter ended March 31, 2010.  For the quarter, the Company reported net income of $7.4 million, or $0.41 diluted EPS and total operating revenues of $68 million, compared to net income of $4 million or $0.43 diluted EPS and total operating revenues of $26.4 million for the same period a year ago.

32.     On May 17, 2010, the Company filed a quarterly report for the period ended March 31, 2010 on a Form 10-Q with the SEC signed by Defendants O'Connor and Dunaway, which reiterated the Company's previously reported financial results and financial position. The Company also reported Commodity and Risk Management segment revenues of $33.5 million or 50% of net revenues, and segment operating income of $21.3 million. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

33.     On August 12, 2010, the Company issued a press release announcing its financial results for the quarter ended June 30, 2010.  For the quarter, the Company reported net income of $6.7 million, or $0.38 diluted EPS and total operating revenues of $78.1 million, compared to net income of $3.6 million or $0.38 diluted EPS and total operating revenues of $22.9 million for the same period a year ago.

34.     On August 12, 2010, the Company filed a quarterly report for the period ended June 30, 2010 on a Form 10-Q with the SEC signed by Defendants O'Connor and Dunaway, which reiterated the Company's previously reported financial results and financial position. The Company also reported Commodity and Risk Management segment revenues of $42.7 million or 56% of net revenues, and segment operating income of $1.7 million.  In addition, the Form 10-Q

contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

35.    On December 14, 2010, the Company issued a press release announcing its financial results for the fourth quarter and fiscal year ended September 30, 2010. For the quarter, the Company reported a net loss of $4.5 million, or $0.26 diluted EPS and total operating revenues of $65.9 million, compared to net income of $16.7 million or $0.1.64 diluted EPS and total operating revenue of $13.4 million for the same period a year ago. For the fiscal year, the Company reported net income of $5.4 million, or $0.30 diluted EPS and total operating revenues of $269 million, compared to net income of $27.6 million, or $2.80 diluted EPS and total operating revenues of $90.6 million for the same period a year ago.

36.    On December 15, 2010, the Company filed an annual report for the year ended September 30, 2010 on a Form 10-K with the SEC signed by, among others, Defendants O'Connor and Dunaway, which reiterated the Company's previously reported financial results and financial position. The Company also reported annual Commodity and Risk Management segment revenues of $129.8 million or 49% of net revenues, and segment operating income of $11.4 million. In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway stating that the financial information contained in the Form 10-K was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

37.    On February 9, 2011, the Company issued a press release announcing its financial results for the quarter ended December 31, 2010. For the quarter, the Company reported net income of $4 million, or $0.22 diluted EPS and total operating revenues of $96.7 million,

11

compared to a net loss of $4.2 million, or ($0.25) diluted EPS and total operating revenues of $59.6 million for the same period a year ago.

38.     That same day, the Company filed a quarterly report for the period ended December 31, 2010 on a Form 10-Q with the SEC signed by Defendants O'Connor and Dunaway, which reiterated the Company's previously reported financial results and financial position. The Company also reported Commodity and Risk Management segment revenues of $54.1 million or 57% of net revenues, and segment operating income of $27.7 million. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

39.     The Company held a conference call on February 10, 2011, to discuss the first quarter 2011 results. During that conference call the Company praised the FCStone merger as a success:

> As we said last quarter, we have now assembled all the capabilities to provide our target customers who are largely mid-sized corporations, with a comprehensive range of risk management, treasury and investment banking services. We have achieved some early meaningful successes that have validated the strategy, but we believe that we are still in the early stages of reaping the full benefits from the acquisitions we have made over the last 18 months.
>
> ***
>
> Every segment of the company experienced growth in adjusted operating revenues in the first quarter as compared to both the prior year first and fourth quarters, with adjusted operating revenues in our core Commodity and Risk Management Services increasing 129% over the prior year period.

40.     On May 10, 2011, the Company issued a press release announcing its financial results for the quarter ended March 31, 2011.  For the quarter, the Company reported net income of $15.4 million, or $0.81 diluted EPS and total operating revenues of $113 million, compared to net income of $7.4 million, or $0.41 diluted EPS and total operating revenues of $65.3 million for the same period a year ago.

41.     That same day, the Company filed a quarterly report for the period ended March 31, 2011 on a Form 10-Q with the SEC signed by Defendants O'Connor and Dunaway, and reiterated the Company's previously reported financial results and financial position.  The Company also reported Commodity and Risk Management segment revenues of $69.5 million or 62% of net revenues, and segment operating income of $44 million. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

42.     On August 9, 2011, the Company issued a press release announcing its financial results for the quarter ended June 30, 2011.  For the quarter, the Company reported net income of $10.4 million, or $0.55 diluted EPS and total operating revenues of $105.4 million, compared to net income of $6.7 million, or $0.38 diluted EPS and total operating revenues of $78.2 million for the same period a year ago.

43.     That same day, the Company filed a quarterly report for the period ended June 30, 2011 on a Form 10-Q with the SEC signed by Defendants O'Connor and Dunaway, which reiterated the Company's previously reported financial results and financial position.  The Company also reported Commodity and Risk Management segment revenues of $65.5 million or 64% of net revenues, and segment operating income of $25.4 million. In addition, the Form 10-Q

contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway, stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

44.    On December 13, 2011, the Company issued a press release announcing its financial results for the fourth quarter and fiscal year ended September 30, 2011. For the quarter, the Company reported net income of $7.5 million, or $0.39 diluted EPS and total operating revenues of $108.1 million, compared to a net loss of $4.5 million, or $0.26 diluted EPS and total operating revenues of $65.9 million for the same period a year ago.  For the fiscal year, the Company reported net income of $37.3 million, or $1.96 diluted EPS and total operating revenues of $423.2 million, compared to net income of $5.4 million, or $0.30 diluted EPS and total operating revenues of $269 million for the same period a year ago.

45.    On December 14, 2011, the Company filed an annual report for the year ended September 30, 2011 on a Form 10-K with the SEC signed by, among others, Defendants O'Connor and Dunaway, which reiterated the Company's previously reported financial results and financial position. The Company also reported annual Commodity and Risk Management segment revenues of $252.6 million or 61% of net revenues and segment operating income of $151.6 million. In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway, stating that the financial information contained in the Form 10-K was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

46.    The statements referenced in ¶¶ 28 - 45 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (1) there existed

critical integration issues with the FCStone Merger, including with respect to financial reporting for its Commodity and Risk Management unit; (2) the Company overstated revenues in trading gains of up to $10.2 million, causing an overstatement of net income by approximately $6.4 million; (3) the Company lacked adequate internal and financial controls; and, (4) as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

## THE TRUTH SLOWLY BEGINS TO EMERGE

47.     On February 8, 2012, the Company issued a press release announcing its financial results for the quarter ended December 31, 2011.  For the quarter, the Company reported a net loss of $400,000, or ($0.02) diluted EPS and total operating revenues of $96.3 million, compared to net income of $4 million, or $0.22 diluted EPS and total operating revenues of $96.7 million for the same period a year ago.  This represented a $20 million decline in revenues from the same period a year earlier.

48.     That same day, the Company filed a quarterly report for the period ended December 31, 2011 on a Form 10-Q with the SEC signed by Defendants O'Connor and Dunaway, which reiterated the Company's previously reported financial results and financial position.  The Company also reported Commodity and Risk Management segment revenues of $50 million or 53.6% of net revenues and segment operating income of $29.8 million. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

49.     On February 9, 2012, the Company held a conference call with investors to discuss its first quarter 2012 performance. During the conference call the Company discussed various critical issues such as slowing revenue streams, falling volume in the commodities market, and overall lack of a clear and compelling business model.   Moreover, Defendant O'Conner attributed the $20 million revenue shortfall to the Company's merged INTL FCStone entities:

> The $20 million revenue decline year-over-year in our commodities business was due to a number of external factors. Firstly, the short-term fallout from the MF Global collapse which resulted in reduced trading volumes as the market loss of a major participant absorbed losses and evaluated the security of segregated funds. Market volumes and open interest were down 30% in some commodities, and directly impacted our results.

50.     Importantly, as highlighted by the Company and analysts' comments during the call, these issues arose principally as a result of "legacy" problems with FCStone's business and problems with integrating the merged INTL FCStone entities. For instance, Defendant O'Connor provided the following response to an analyst's question:

> Analyst: Okay, great. And then the last question. How are the conditions in the current quarter? I mean, have you seen anything change, or is it still everyone sort of sitting on their hands and volatility is down? **Especially in terms of the soft commodities, the legacy FCStone business**?
>
> Defendant O'Connor: Yeah, it's, you know, honestly, it's tough because we watch sort of our numbers day-to-day. So if we have a good day and you ask me that question, I'm much more optimistic. If I just step back a little bit, I would say January was probably sort of more of the same, frankly. Maybe mildly better. And certainly February seems to be slowly sort of picking up speed, so it's too early to call yet. But it's a tough environment and people are still pretty nervous about what happened with MF. I think there is less volatility in the market and less inducement for people to do things. And on the Ag side of the business, we found that a lot of people have just sat on the harvest, they haven't delivered the harvest in, and that's a big part of our business.

And this happened to us two years ago. **Just straight off to the merger with FCStone, you know, we had sort of revenues that should have come in Q1 that didn't. And some of those revenues will be pushed out into Q2 and Q3. So some of it's a little bit of a timing issue,** some of it is general market conditions, but none of those factors are in our favor right now.

[Emphasis added.]

51.     On this news, the Company's shares fell $3.94 per share, or 14%, to close on February 9, 2012 at $22.54 per share.

52.     On May 9, 2012, the Company issued a press release announcing its financial results for the quarter ended March 31, 2012.  For the quarter, the Company reported net income of $2.4 million, or $0.12 diluted EPS and total operating revenues of $119.6 million, compared to net income of $15.4 million, or $0.81 diluted EPS and total operating revenues of $113 million for the same period a year ago.

53.     That same day, the Company filed a quarterly report for the period ended March 31, 2012 on a Form 10-Q with the SEC signed by Defendants O'Connor and Dunaway, and reiterated the Company's previously reported financial results and financial position.   The Company also reported Commodity and Risk Management segment revenues of $65.7 million or 56% of net revenues and segment operating income of $37 million. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

54.     On August 8, 2012, the Company issued a press release announcing its financial results for the quarter ended June 30, 2012.  For the quarter, the Company reported net income of $4.7 million, or $0.23 diluted EPS and total operating revenues of $123.8 million, compared to

net income of $10.4 million, or $0.55 diluted EPS and total operating revenues of $105.4 million for the same period a year ago.

55.     That same day, the Company filed a quarterly report for the period ended June 30, 2012 on a Form 10-Q with the SEC signed by Defendants O'Connor and Dunaway, and reiterated the Company's previously reported financial results and financial position. The Company also reported annual Commodity and Risk Management segment revenues of $67 million or 55% of net revenues and segment operating income of $38.3 million. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

56.     On December 12, 2012, the Company issued a press release announcing its financial results for the fourth quarter and fiscal year ended September 30, 2012. For the quarter, the Company reported net income of $8.3 million, or $0.42 diluted EPS and total operating revenues of $118 million, compared to net income of $7.5 million, or $0.39 diluted EPS and total operating revenues of $108.1 million for the same period a year ago. For the fiscal year, the Company reported net income of $15 million, or $0.75 diluted EPS and total operating revenues of $457.7 million, compared to net income of $37.3 million, or $1.96 diluted EPS and total operating revenues of $423.2 million for the same period a year ago.

57.     That same day, the Company filed an annual report for the year ended September 30, 2012 on a Form 10-K with the SEC signed by, among others, Defendants O'Connor and Dunaway, which reiterated the Company's previously reported financial results and financial position. The Company also reported Commodity and Risk Management annual segment revenues of $246 million or 55% of net revenues, and segment operating income of $143

million. In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway stating that the financial information contained in the Form 10-K was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

58.     The 10-K reported that on November 2011, the Commodity Futures Trading Commission ("CFTC") Division of Enforcement Staff ("Staff") requested the Company to voluntarily produce specified documents to the Staff in connection with its then informal investigation of the losses that occurred in 2008 in the customer energy trading account of FCStone, LLC. In September 2012, the Staff provided the Company with a Wells notice, indicating the Staff's intention to recommend that the CFTC bring certain charges against FCStone, LLC. The Company filed its Wells Submission with the Staff in October 2012, and the Company is in ongoing discussions with the CFTC regarding this matter.

59.     As a result of this disclosure, the Company's shares fell $.30 per share to $17.88, or 1.6%.

60.     On February 7, 2013, the Company issued a press release announcing its financial results for the quarter ended December 31, 2012.  For the quarter, the Company reported net income of $13.3 million, or $0.68 diluted EPS and total operating revenues of $125.7 million, compared to a net loss of $400,000, or ($0.02) diluted EPS and total operating revenues of $96.3 million for the same period a year ago.

61.     That same day, the Company filed a quarterly report for the period ended December 31, 2012 on a Form 10-Q with the SEC, signed by Defendants O'Connor and Dunaway, which reiterated the Company's previously reported financial results and financial position. The Company also reported annual Commodity and Risk Management segment

revenues of $60.7 million or 50% of net revenues and segment operating income of $40.5 million. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

62. On May 8, 2013, the Company issued a press release announcing its financial results for the quarter ended March 31, 2013. For the quarter, the Company reported net income of $1.5 million, or $0.08 diluted EPS and total operating revenues of $117.3 million, compared to net income of $2.4 million, or $0.12 diluted EPS and total operating revenues of $119.6 million for the same period a year ago.

63. That same day, the Company filed a quarterly report for the period ended March 31, 2013 on a Form 10-Q with the SEC signed by Defendants O'Connor and Dunaway, which reiterated the Company's previously reported financial results and financial position. The Company also reported Commodity and Risk Management segment revenues of $56.1 million or 49% of net revenues and segment operating income of $12.6 million. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway, stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

64. On August 7, 2013, the Company issued a press release announcing its financial results for the quarter ended June 30, 2013. For the quarter, the Company reported net income of $2.8 million, or $0.15 diluted EPS and total operating revenues of $122.1 million, compared to net income of $4.7 million, or $0.23 diluted EPS and total operating revenues of $123.8 million for the same period a year ago.

65.     That same day, the Company filed a quarterly report for the period ended June 30, 2013 on a Form 10-Q with the SEC signed by Defendants O'Connor and Dunaway, which reiterated the Company's previously reported financial results and financial position. The Company also reported Commodity and Risk Management segment revenues of $56.2 million or 48% of net revenues and segment operating income of $31.2 million. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway, stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

66.     On December 17, 2013, the Company filed a Form 12b-25 with the SEC, "stating that the Company was not able to file its Form 10-K for the fiscal year ended September 30, 2013 on the due date." The Company provided the following explanation:

> In connection with the preparation of its consolidated financial statements for the fiscal year ended September 30, 2013, INTL FCStone identified errors in the reconciliation of the Company's subsidiary INTL FCStone Markets, LLC's accounting records to its back office system, which has resulted in a delay in finalizing the Company's consolidated financial statements required to be included in the Company's Form 10-K. As a result, the Company is evaluating the effect these errors may have on previously filed consolidated financial statements covering the Company's interim periods for the fiscal year ended September 30, 2013 as well as the previously filed audited and interim consolidated financial statements for the Company's fiscal years ended September 30, 2012 and 2011.
>
> The Company believes these errors may reflect an overstatement of revenues in trading gains, net in prior fiscal periods of up to $10.2 million and correspondingly an overstatement of net income of up to approximately $6.4 million. The errors do not relate to any customer-owned collateral. The Company has not yet determined whether the errors will have a material impact on the Company's previously reported consolidated financial information, and therefore the Audit Committee cannot yet conclude that such consolidated financial statements and the information derived therefrom should no longer be relied upon. If, upon further review, the Audit Committee determines that any previously issued consolidated financial statement should no longer be relied upon because

of the errors, the Company will file a Current Report on Form 8-K disclosing the Audit Committee's determination.

67.     On this news, INTL FCStone securities declined $1.62 per share or nearly 8%, to close at $18.93 per share on December 17, 2013.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

68.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired INTL FCStone securities during the Class Period (the "Class"); and were damaged thereby.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

69.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, INTL FCStone securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by INTL FCStone or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

70.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

71.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

72.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of INTL FCStone;

- whether the Individual Defendants caused INTL FCStone to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of INTL FCStone securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

73.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

74.     Plaintiff will rely, in part, upon the presumption of reliance established by the

fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- INTL FCStone securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold INTL FCStone securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

75.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a

presumption of reliance upon the integrity of the market.

76.     Alternatively, Plaintiffs and the members of the Class are entitled to the

presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State*

*of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material

information in their Class Period statements in violation of a duty to disclose such information,

as detailed above.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

77.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

78.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

79.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of INTL FCStone securities; and (iii) cause Plaintiff and other members of the Class to purchase INTL FCStone securities and options at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

80.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for INTL FCStone securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about INTL FCStone's finances and business prospects.

81.     By virtue of their positions at INTL FCStone, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

82.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of INTL FCStone, the Individual Defendants had knowledge of the details of INTL FCStone internal affairs.

83.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of INTL FCStone. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to INTL FCStone's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and

public statements, the market price of INTL FCStone securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning INTL FCStone's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased INTL FCStone securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

84.     During the Class Period, INTL FCStone securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of INTL FCStone securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid.  At the time of the purchases by Plaintiff and the Class, the true value of INTL FCStone securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of INTL FCStone securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

85.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

86.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases

and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

87.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

88.     During the Class Period, the Individual Defendants participated in the operation and management of INTL FCStone, and conducted and participated, directly and indirectly, in the conduct of INTL FCStone's business affairs.  Because of their senior positions, they knew the adverse non-public information about INTL FCStone's misstatement of income and expenses and false financial statements.

89.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to INTL FCStone's financial condition and results of operations, and to correct promptly any public statements issued by INTL FCStone which had become materially false or misleading.

90.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which INTL FCStone disseminated in the marketplace during the Class Period concerning INTL FCStone's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause INTL FCStone to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of INTL FCStone within the meaning of Section 20(a) of the Exchange

Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of INTL FCStone securities.

91.     Each of the Individual Defendants, therefore, acted as a controlling person of INTL FCStone. By reason of their senior management positions and/or being directors of INTL FCStone, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, INTL FCStone to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of INTL FCStone and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

92.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by INTL FCStone.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: January 13, 2014

**POMERANTZ LLP**

Jeremy A. Lieberman
Lesley F. Portnoy
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com
lfportnoy@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.    I, _Paul Woebel___, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.    I have reviewed a Complaint against INTL FCStone Inc. ("INTL FCStone" or the "Company") and, authorize the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire INTL FCStone securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.     I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired INTL FCStone securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.  To the best of my current knowledge, the attached sheet lists all of my transactions in INTL FCStone securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not sought to serve as a representative party on behalf of a class under the federal securities laws.

7.     I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.   I declare under penalty of perjury that the foregoing is true and correct.


Executed __12/31/13_____
                    **(Date)**


                                                    _____
                                                                    **(Signature)**


                        Paul Woebel _____
                                        **(Type or Print Name)**

## SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|------|------------------|------------------|-----------------|
| 4/15/11 | Purchase | 1,024 | $25.75 |
| 7/15/11 | Purchase | 346 | 24.74 |
| 11/15/11 | Purchase | 100 | 24.82 |
| 12/15/11 | Purchase | 1,062 | 24.65 |
| 1/31/12 | Purchase | 1,120 | 25.66 |
| | | | |
| | | | |
| | | | |
| 5/14/12 | Sale | 427 | 19.70 |
| 8/13/12 | Sale | 144 | 18.20 |
| 10/15/12 | Sale | 656 | 18.67 |
| 10/16/12 | Sale | 249 | 19.10 |
| 10/22/12 | Sale | 1399 | 18.40 |
| 10/24/12 | Sale | 330 | 18.41 |
| 10/31/12 | Sale | 247 | 18.20 |
| 11/7/12 | Sale | 200 | 18.25 |
| | | | |
| | | | |
| | | | |
| | | | |