UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

PAUL WOEBEL, Individually and on Behalf
of All Others Similarly Situated,

                         Plaintiff,

       vs.

INTL FCSTONE, INC., SEAN M.
O'CONNOR, and WILLIAM J. DUNAWAY,

                       Defendants.

———————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:14-cv-00232-AKH

CLASS ACTION

SECOND AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ...................................................................................1

JURISDICTION AND VENUE ...............................................................................5

PARTIES ..................................................................................................................6

CLASS ACTION ALLEGATIONS .........................................................................9

SUBSTANTIVE ALLEGATIONS ........................................................................11

    Background ................................................................................................11

    Materially False and Misleading Statements Issued During the Class
    Period ........................................................................................................13

        Statement 1: Fiscal Year 2010 Earnings Release and Form 10-K.............13

            Falsity of Statement 1 ...............................................................15

            Defendants' Contemporaneous Reckless Disregard of the
            Falsity of Statement 1 ...............................................................16

        Statement 2: 1Q11 Earnings Release and Form 10-Q .............................18

            Falsity of Statement 2 ...............................................................18

            Defendants' Contemporaneous Reckless Disregard of the
            Falsity of Statement 2 ...............................................................19

        Statement 3: 2Q11 Earnings Release and Form 10-Q .............................21

            Falsity of Statement 3 ...............................................................22

            Defendants' Contemporaneous Reckless Disregard of the
            Falsity of Statement 3 ...............................................................23

        Statement 4: 3Q11 Earnings Release, Form 10-Q and Conference
        Call........................................................................................................24

            Falsity of Statement 4 ...............................................................26

            Defendants' Contemporaneous Reckless Disregard of the
            Falsity of Statement 4 ...............................................................27

**Page**

Statement 5: Fiscal Year 2011 Earnings Release and Form 10-K ............ 28

    Falsity of Statement 5 ................................................. 29

    Defendants' Contemporaneous Reckless Disregard of the
    Falsity of Statement 6 ................................................. 30

The February 9, 2012 Partial Disclosure ................................... 32

Statement 6: 1Q12 Earnings Release and Form 10-Q ........................... 35

    Falsity of Statement 6 ................................................. 35

    Defendants' Contemporaneous Reckless Disregard of the
    Falsity of Statement 6 ................................................. 36

Statement 7: 2Q12 Earnings Release and Form 10-Q ........................... 38

    Falsity of Statement 7 ................................................. 38

    Defendants' Contemporaneous Reckless Disregard of the
    Falsity of Statement 7 ................................................. 39

Statement 8: 3Q12 Earnings Release and Form 10-Q ........................... 41

    Falsity of Statement 8 ................................................. 42

    Defendants' Contemporaneous Reckless Disregard of the
    Falsity of Statement 8 ................................................. 43

Statement 9: Fiscal Year 2012 Earnings Release and Form 10-K ............ 44

    Falsity of Statement 9 ................................................. 45

    Defendants' Contemporaneous Reckless Disregard of the
    Falsity of Statement 9 ................................................. 46

Statement 10: 1Q13 Earnings Release and Form 10-Q ........................... 48

    Falsity of Statement 10 ................................................. 48

    Defendants' Contemporaneous Reckless Disregard of the
    Falsity of Statement 10 ................................................ 49

**Page**

Statement 11: 2Q13 Earnings Release and Form 10-Q ...........................51

    Falsity of Statement 11 ................................................52

    Defendants' Contemporaneous Reckless Disregard of the Falsity of Statement 11 ...............................................53

Statement 12: 3Q13 Earnings Release and Form 10-Q ...........................54

    Falsity of Statement 12 ................................................55

    Defendants' Contemporaneous Reckless Disregard of the Falsity of Statement 12 ...............................................56

The December 17, 2013 Partial Disclosure ...............................58

The January 9, 2014 Partial Disclosure .................................58

INTL FCStone's Financial Statements Violated GAAP ....................64

ADDITIONAL SCIENTER ALLEGATIONS.........................................66

LOSS CAUSATION/ECONOMIC LOSS ...........................................68

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE .................................................................70

NO SAFE HARBOR ...........................................................72

COUNT I ..................................................................72

    (Against All Defendants For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder)....................72

COUNT II .................................................................75

    (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)........................................................75

PRAYER FOR RELIEF ........................................................76

DEMAND FOR TRIAL BY JURY .................................................77

International Union of Painters & Allied Trades District Council No. 35 Pension Plan and Annuity Fund ("Lead Plaintiff"), has alleged the following based upon the investigation of Lead Plaintiff's counsel.  The investigation included, *inter alia*, a review of United States Securities and Exchange Commission ("SEC") filings by INTL FCStone, Inc. f/k/a International Assets Holding Corporation ("INTL FCStone" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media and analyst reports about the Company. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons or entities other than Defendants[1] who purchased INTL FCStone common stock between December 15, 2010 and December 16, 2013, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder by the SEC, against the Company and certain of its officers.

2.      INTL FCStone is a financial services holding company.  On December 17, 2013, at the end of the Class Period, the Company announced that it would have to delay filing its Form 10-K for the fiscal year ended September 30, 2013 because of "identified errors in the reconciliation of the Company's subsidiary INTL FCStone Markets, LLC's accounting records to its back office system . . . ."  Three weeks later, on January 9, 2014, the Company announced

---

[1]    As defined below, the Defendants are INTL FCStone, Inc. ("INTL FCStone" or the "Company"); Sean M. O'Connor ("O'Connor"), the Company's Chief Executive Officer; and William J. Dunaway ("Dunaway"), the Company's Chief Financial Officer.

that it would be restating its previously filed financial statements for the years ended September 30, 2011 and 2012 because of aggregate accounting errors, with a cumulative effect of 9% of aggregate earnings over the period.

3.     The restatement admitted that the financial statements at issue were false at the time they were made.   In announcing this restatement, Defendant O'Connor explicitly and implicitly admitted the materiality of the misstatements.

4.     Given the Company's history, Defendants recklessly disregarded the falsity of their prior statements.   INTL FCStone was created just six months before the start of the Class Period through the merger of two publicly traded companies.   The merger transformed the Company, doubling its net asset value, quadrupling its assets, and tripling its employees. Defendant O'Connor claimed to accomplish, over the course of ***only one year***, what Defendants had envisioned doing in ***two to three years***: developing more comprehensive over-the-counter ("OTC") and structured-products capabilities for its commercial customers.[2]

5.     Rather than achieving this goal through the steady, organic process they had planned, however, Defendants did so by acquiring six financial services companies in one year's time.   These acquisitions nearly doubled the Company's customer count, increased its employee headcount by 59%, and expanded the Company geographically on three continents.

6.     One of the six acquired companies, Hanley Capital Group ("Hanley"), was integrated into the existing OTC trade desk of FCStone Group, a wholly owned subsidiary of INTL FCStone, to create an entity known as "INTL FCStone Markets LLC."   INTL FCStone

---

[2]     Specifically, during an earnings conference call at the start on December 15, 2010, Defendant O'Connor stated: "Given the demand of the merger integration, we had envisaged that this process would be achieved through steady, organic process, which would take two to three years to achieve.   Instead, [we're] able to identify suitable acquisition targets that allowed us to build these capabilities during the past fiscal year, significantly ahead of plan."

Markets LLC was a part of the "Commodity and Risk Management" unit.  Following the Hanley acquisition, Commodity and Risk Management quickly became the main source of the Company's revenues throughout the Class Period, contributing as much as 64% of total net revenues to the Company.

7.      Despite these dramatic changes, Defendants claimed – throughout the Class Period – that their financial results and related certifications accurately reflected the Company's financial condition and internal controls over financial reporting.

8.      In addition, throughout the Class Period, Defendants O'Connor and Dunaway signed sworn certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") stating that the Company's internal controls over financial reporting, which they personally designed, or caused to be designed under their supervision, were effective and contained no material weaknesses.

9.      During the Class Period, Defendants downplayed the existence of any integration issues with the Hanley acquisition.  Indeed, Defendants steadfastly denied any integration problems with Hanley, falsely touting that the integration was going "really well," and claiming that any issues were "not so much of integration, but of capacity."

10.     However, during the Class Period, Defendants knew that the complexity created by causing Hanley to deliver its services to the Company's 8,000 commercial customers "pretty quickly overwhelmed" that segment – a critical red flag to Defendants about problems with the Hanley acquisition.

11.     Despite this knowledge, Defendants continued to issue false financial statements and statements regarding the Company's internal controls.

12.     Then, two and a half years later, Defendants announced the restatement.  In so doing, Defendants admitted not only the contemporaneous falsity of the Company's financial

statements and their materiality, but also the source of the problem: the integration of Hanley.  In stark contrast to their prior representations, Defendants acknowledged that the errors that necessitated the restatement related to the acquisition of the Hanley swaps business.  During an earnings conference call on January 9, 2014, O'Connor attributed the overstatement of income and false financial statements to the fact that the Company could not handle the increased business brought on by the Hanley acquisition: "we more than doubled our transactional volumes on this business and saw a dramatic ramp-up of revenues which exacerbated the situation."

13.     Defendants also admitted that their prior representations about the effectiveness of the Company's internal controls over financial reporting (which they personally designed and evaluated, or caused to be designed and evaluated under their supervision) were false at the time they were made. In fact, Defendants admitted those material weaknesses caused the Company's misstated financials.

14.     Defendants' reckless disregard of the falsity of their Class Period representations is established through the following facts, among others, which must be viewed holistically: (a) Defendants knew the Company had just completed the transformational FCStone merger; (b) Defendants knew the Company completed six additional key acquisitions in the span of just twelve months; (c) Defendants knew the Company had just nearly doubled its customer count; (d) Defendants knew that the Company just engaged in a geographic expansion to South America, Europe and Asia; (e) Defendants knew that the Company's employee headcount had increased by 59%; (f) Defendants knew that they expedited the growth of the Company far in excess of what they had originally planned; (g) Defendants knew they had overwhelmed the Hanley business to the point that the Hanley personnel could not handle the roll-out of its capabilities to the Company's 8,000 commercial customers; (h) the Individual Defendants had a

statutory duty to design and monitor the Company's internal controls; (i) the Hanley business constituted the core operations of the Company; and (j) the Company violated Generally Accepted Accounting Principles ("GAAP").   In light of these facts, Defendants acted with scienter.

15.     As a result of Defendants' wrongful acts and omissions, Lead Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

17.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. §1331.

18.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).   INTL FCStone maintains its principal executive offices in this District, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in this District.   Additionally, the securities of INTL FCStone are publicly traded in this District.

19.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

20.     Lead Plaintiff purchased the common stock of INTL FCStone during the Class Period, as set forth in the certification previously filed with the Court (Dkt. No. 18-2) and incorporated by reference herein, and has been damaged thereby.

21.     Defendant INTL FCStone is a Delaware corporation with its headquarters located at 708 Third Avenue, New York, New York 10017.  Its common stock is traded on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "INTL."

22.     Defendant Sean M. O'Connor ("O'Connor") has served at all relevant times as the Company's Chief Executive Officer ("CEO").  O'Connor joined INTL in October 2002 as CEO.  In December 2002, he was elected to the Board of Directors.

23.     Defendant William J. Dunaway ("Dunaway") has served at all relevant times as the Company's Chief Financial Officer ("CFO").  Dunaway was appointed CFO of the Company on October 5, 2009 following the FCStone Merger.  From January 2008 until the merger, Dunaway was the CFO of FCStone.

24.     The defendants referenced above in ¶¶22-23 are referred to herein as the "Individual Defendants."  INTL FCStone and the Individual Defendants are collectively referred to herein as "Defendants."

25.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of INTL FCStone, were privy to confidential and proprietary information concerning INTL FCStone, its operations, finances, financial condition and present and future business prospects.  The Individual Defendants also had access to material, adverse non-public information concerning INTL FCStone, as discussed in detail below.  Because of their positions with INTL FCStone, the Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via internal

corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

26.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the Individual Defendants, by virtue of their high-level positions with the Company and/or control of the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

27.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the

unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of INTL FCStone's business.

28.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of the Company's reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

29.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to INTL FCStone's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of INTL FCStone common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

30.     The Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of INTL FCStone common stock by disseminating materially false and misleading statements and/or concealing material adverse

facts.  The scheme: (i) deceived the investing public regarding INTL FCStone's business, operations and management and the intrinsic value of INTL FCStone common stock; (ii) allowed the Individual Defendants to cause INTL FCStone to pay them hundreds of thousands of dollars in stock awards and non-equity incentive plan compensation during the Class Period; and (iii) caused Lead Plaintiff and members of the Class to purchase INTL FCStone common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

31.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired INTL FCStone securities during the Class Period, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

32.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, INTL FCStone securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Lead Plaintiff at this time and can be ascertained only through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by INTL FCStone or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

33.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

34.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

35.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of INTL FCStone;

(c)     whether the price of INTL FCStone common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

36.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

37.     INTL FCStone is a financial services holding company employing more than 1,000 people in offices in twelve countries.  The Company provides comprehensive risk-management advisory services to mid-sized commercial customers.  The Company also utilizes its expertise and capital to provide foreign exchange and treasury services, securities execution, physical commodities trading services and execution in both listed futures and option contracts as well as structured OTC products in a wide range of commodities.

38.     In September 2009, International Assets completed the transformational merger with FCStone.  International Assets shareholders received 52.5% of the combined entity – although FCStone had been a significantly larger company prior to the financial crisis of 2008. To put it in perspective, FCStone had four times the revenue and more than five times the market capitalization of International Assets.  FCStone's credit crisis woes set the stage for International Assets to accomplish the deal while maintaining a majority stake.

39.     The FCStone Merger created a new company with twice the net asset value, four times the assets, three times the employees, and with a much larger global reach and customer base than International Assets had before the merger.

40.     Before the Defendants could even integrate International Assets with FCStone, the newly combined entity undertook a series of offensive moves, completing six acquisitions and hiring several senior banking executives between early 2010 and early 2011.   The Company's key acquisitions during this time included the following:

- **Hanley Group Capital** – a Chicago-based commodity trading firm, specializing in risk management and sophisticated structured OTC products, and focused on agricultural commodities;

- **Risk Management Incorporated ("RMI")** – a Chicago-based introducing broker and consulting firm, specializing in the development and execution of price-risk and credit-risk management programs in the energy sector;

- **Provident Group –** a New York based investment banking and advisory firm to the middle market;

- **Hencorp Becstone Futures –** the futures operation of Miami-based Hencorp Group, specializing in the development and execution of risk-management programs to hedge price volatility in widely traded commodities;

- **Ambrian Commodities Limited ("ACL") –** the London Metals Exchange ("LME") brokerage subsidiary of Ambrian Capital Plc.  London-based, ACL is currently a non-clearing LME member, specializing in the development and execution of risk-management programs designed to hedge price fluctuations in base metals; and

- **Hudson Capital Energy ("HCEnergy") –** a New York-based energy risk-management firm, which includes HCEnergy's Swiss subsidiary and HCEnergy Europe GmbH.

41.     According to Defendant O'Connor, "[g]iven the demand of the [FCStone Merger] integration," Defendants had planned to develop more comprehensive OTC and structured-products capabilities "through [a] steady, organic process, which would take ***two to three years*** to achieve."  But due to its flurry of acquisitions, the Company was able to build these capabilities in ***only one year***, "significantly ahead of plan."

42.     As a result of these acquisitions, the Company nearly doubled its customer count from approximately 11,000 to over 20,000 in a span of just a few months.

43.     In addition to this acquisition binge, the Company also expanded geographically in South America, Europe and Asia, and increased its total headcount from 630 in 2Q10 to nearly 1,000 in 4Q11.

44.     The challenges of integrating six companies acquired in just one year, which added twice as many customers and nearly 60% more employees – all on the heels of the transformational FCStone Merger that was completed only a year-and-a-half earlier – were red

flags to O'Connor and Dunaway warning that they needed increased focus on the Company's internal controls and reconciliation processes.  Defendants were required to give heightened attention to the integration of the Hanley business when designing and evaluating the Company's internal controls because this segment quickly became the Company's largest source of revenue throughout the Class Period.

**Materially False and Misleading**
**Statements Issued During the Class Period**

**Statement 1: Fiscal Year 2010 Earnings Release and Form 10-K**

45.     On December 14, 2010, after the market closed, the Company issued a press release announcing its financial results for the fourth quarter and fiscal year 2010 ended September 30, 2010.  For the quarter, the Company reported a net loss of $4.5 million, or ($0.26) diluted EPS and total operating revenues of $65.9 million, compared to net income of $16.7 million or $1.64 diluted EPS and total operating revenue of $13.4 million for the same period a year ago.  For the fiscal year, the Company reported net income of $5.4 million, or $0.30 diluted EPS and total operating revenues of $269 million, compared to net income of $27.6 million, or $2.80 diluted EPS and total operating revenues of $90.6 million for the same period a year ago. On December 15, 2010, the Company filed an annual report for the year ended September 30, 2010 on a Form 10-K with the SEC signed by, among others, Defendants O'Connor and Dunaway, which reiterated the Company's previously reported financial results and financial position.  The Company stated that its financial statements were prepared in accordance with GAAP.[3]

---

[3]     The Commodity and Risk Management segment had differences between the GAAP results and the adjusted non-GAAP marked-to-market results.

46.     In addition, the Form 10-K contained certifications signed by Defendants O'Connor and Dunaway pursuant to §302 of the Sarbanes-Oxley Act of 2002, representing that the financial information contained in the report was true, that it did not omit material facts, and that the Company's disclosures on internal controls and procedures were adequate.    Each certification stated, in pertinent part, as follows:

1.  I have reviewed this Annual Report on Form 10-K of International Assets Holding Corporation;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d—15(f)) for the registrant and have:

(a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)   Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

47.   The Form 10-K also contained certifications signed by Defendants O'Connor and Dunaway pursuant to 18 U.S.C. §1350, as adopted pursuant to §906 of the Sarbanes-Oxley Act of 2002.  Each certification stated, in pertinent part, as follows:

(1)  The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**Falsity of Statement 1**

48.   The statements in ¶¶45-47 were materially false and misleading at the time they were made because, as Defendants themselves admitted in the restatement:

(a)  INTL FCStone overstated revenues in trading gains of up to $10.2 million, causing an overstatement of net income for fiscal year 2010 of $1.2 million (which caused an annual impact on net income for 2010 of -10%), and a cumulative overstatement of net income of $5.9 million during the Class Period;

(b)  INTL FCStone's financial statements, and other financial information included in the Form 10-K, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-K;

- 15 -

(c)     INTL FCStone's financial statements, and other financial information included in the Form 10-K, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-K;

(d)     the Individual Defendants failed to adequately design disclosure controls and procedures, or failed to cause such disclosure controls and procedures to be designed under their supervision, to ensure that material information regarding the Company was made known to them by others within the Company;

(e)     the Individual Defendants failed to adequately design internal controls over financial reporting, or failed to cause such internal controls over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP;

(f)     the Individual Defendants failed to adequately evaluate the effectiveness of the Company's disclosure controls and procedures;

(g)     the Individual Defendants falsely presented in the Form 10-K their conclusions about the effectiveness of the Company's disclosure controls and procedures;

(h)     the Form 10-K did not fully comply with the requirements of Section 13(a) or 15(d) of the Exchange Act;

(i)     INTL FCStone's financial statements were not prepared in accordance with GAAP or the Company's own stated accounting policies, as detailed in ¶¶110-118; and

(j)     INTL FCStone's internal controls were materially deficient, as detailed in ¶109.

**Defendants' Contemporaneous Reckless Disregard of the Falsity of Statement 1**

49.     The following facts, viewed holistically, establish Defendants' scienter with respect to the false statements contained in ¶¶45-47:

(a)     **Defendants Ignored Critical Red Flags that Put Them on Notice that the Company Was Vulnerable to False Financial Statements and Control Deficiencies**

(i)     Defendants knew the Company had just completed the transformational FCStone merger;

(ii)     Defendants knew the Company completed six additional key acquisitions in the span of just twelve months;

(iii)     Defendants knew the Company had just nearly doubled its customer count;

(iv)     Defendants knew that the Company just engaged in a geographic expansion to South America, Europe and Asia;

(v)     Defendants knew that the Company's employee headcount had increased by 59%; and

(vi)     Defendants knew that they expedited the growth of the Company far in excess of what they had originally planned.

(b)     **The Individual Defendants Failed to**
        **Check Information They Had a Duty to Monitor**

(i)     The Individual Defendants had a statutory duty to monitor the Company's internal controls pursuant to SOX, and their failure to check information they had a duty to monitor constitutes recklessness;

(ii)     The Individual Defendants falsely certified the Company's internal controls pursuant to SOX;

(iii)     The Individual Defendants admittedly: (1) were personally responsible for establishing and maintaining INTL FCStone's internal controls over financial reporting; and (2) personally designed such internal controls over financial reporting, or caused such controls over financial reporting to be designed under their supervision; and

(iv)     As evidenced by the restatement, the Company did not maintain effective internal controls.

(c)     **Core Operations Doctrine**

(i)     During the Class Period, there was nothing more central to INTL FCStone's core operations than the Commodity and Risk Management division, into which Hanley was integrated after its acquisition;

(ii)     Prior to the Hanley acquisition in July 2010, the revenues from Commodity and Risk Management accounted for 40% of the Company's net revenues. After the Hanley acquisition, Commodity and Risk Management's contribution to the Company's net revenues increased significantly, *see* ¶121;

(iii)     Because the Hanley segment and its operations were indisputably a significant part of INTL FCStone, knowledge of the problems with Hanley's accounting are properly imputed to Defendants; and

(iv)     Where the accounting irregularities relate to accounting practices that are sufficiently critical to the core operations of the company, knowledge of the accounting

- 17 -

improprieties are properly imputed to the company's officers and directors who are involved in the day-to-day operations of the company.

(d)      **GAAP Violations**

(i)      The restatement confirms that the Company committed significant violations of GAAP.  *See* ¶¶110-118; and

(ii)      When significant GAAP violations are described with particularity, they provide powerful indirect evidence of scienter.

**Statement 2: 1Q11 Earnings Release and Form 10-Q**

50.      On February 9, 2011, the Company issued a press release announcing its financial results for the first quarter of fiscal year 2011 ended December 31, 2010.  For the quarter, the Company reported net income of $4 million, or $0.22 diluted EPS and total operating revenues of $96.7 million, compared to a net loss of $4.2 million, or ($0.25) diluted EPS and total operating revenues of $59.6 million for the same period a year ago.  That same day, the Company filed a quarterly report for the period ended December 31, 2010 on a Form 10-Q with the SEC signed by Defendants O'Connor and Dunaway, which reiterated the Company's previously reported financial results and financial position.  The Company stated that its financial statements were prepared in accordance with GAAP.

51.      In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway, stating that the financial information contained in the Form 10-Q was accurate, the Company's internal controls were effective, and disclosed any material changes to the Company's internal control over financial reporting.

**Falsity of Statement 2**

52.      The statements in ¶¶50-51 were materially false and misleading at the time they were made because, as Defendants themselves admitted in the restatement:

(a)      INTL FCStone overstated revenues in trading gains of up to $10.2 million, causing an overstatement of net income for fiscal year 2011 of $2.5 million (which caused an

annual impact on net income for 2011 of -7%), and a cumulative overstatement of net income of $5.9 million during the Class Period;

        (b)    INTL FCStone's financial statements, and other financial information included in the Form 10-Q, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-Q;

        (c)    INTL FCStone's financial statements, and other financial information included in the Form 10-Q, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-Q;

        (d)    the Individual Defendants failed to adequately design disclosure controls and procedures, or failed to cause such disclosure controls and procedures to be designed under their supervision, to ensure that material information regarding the Company was made known to them by others within the Company;

        (e)    the Individual Defendants failed to adequately design internal controls over financial reporting, or failed to cause such internal controls over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP;

        (f)    the Individual Defendants failed to adequately evaluate the effectiveness of the Company's disclosure controls and procedures;

        (g)    the Individual Defendants falsely presented in the Form 10-Q their conclusions about the effectiveness of the Company's disclosure controls and procedures;

        (h)    the Form 10-Q did not fully comply with the requirements of Section 13(a) or 15(d) of the Exchange Act;

        (i)    INTL FCStone's financial statements were not prepared in accordance with GAAP or the Company's own stated accounting policies, as detailed in ¶¶110-118; and

        (j)    INTL FCStone's internal controls were materially deficient, as detailed in ¶109.

### Defendants' Contemporaneous Reckless Disregard of the Falsity of Statement 2

53.    The following facts, viewed holistically, establish Defendants' scienter with respect to the false statements contained in ¶¶50-51:

(a)     **Defendants Ignored Critical Red Flags that Put
Them on Notice that the Company Was Vulnerable
to False Financial Statements and Control Deficiencies**

(i)     Defendants knew the Company had just completed the transformational FCStone merger;

(ii)     Defendants knew the Company completed six additional key acquisitions in the span of just twelve months;

(iii)     Defendants knew the Company had just nearly doubled its customer count;

(iv)     Defendants knew that the Company just engaged in a geographic expansion to South America, Europe and Asia;

(v)     Defendants knew that the Company's employee headcount had increased by 59%; and

(vi)     Defendants knew that they expedited the growth of the Company far in excess of what they had originally planned.

(b)     **The Individual Defendants Failed to
Check Information They Had a Duty to Monitor**

(i)     The Individual Defendants had a statutory duty to monitor the Company's internal controls pursuant to SOX, and their failure to check information they had a duty to monitor constitutes recklessness;

(ii)     The Individual Defendants falsely certified the Company's internal controls pursuant to SOX;

(iii)     The Individual Defendants admittedly: (1) were personally responsible for establishing and maintaining INTL FCStone's internal controls over financial reporting; and (2) personally designed such internal controls over financial reporting, or caused such controls over financial reporting to be designed under their supervision; and

(iv)     As evidenced by the restatement, the Company did not maintain effective internal controls.

(c)     **Core Operations Doctrine**

(i)     During the Class Period, there was nothing more central to INTL FCStone's core operations than the Commodity and Risk Management division, into which Hanley was integrated after its acquisition;

(ii)     Prior to the Hanley acquisition in July 2010, the revenues from Commodity and Risk Management accounted for 40% of the Company's net revenues. After the

- 20 -

Hanley acquisition, Commodity and Risk Management's contribution to the Company's net revenues increased significantly, *see* ¶121;

    (iii)  Because the Hanley segment and its operations were indisputably a significant part of INTL FCStone, knowledge of the problems with Hanley's accounting are properly imputed to Defendants; and

    (iv)  Where the accounting irregularities relate to accounting practices that are sufficiently critical to the core operations of the company, knowledge of the accounting improprieties are properly imputed to the company's officers and directors who are involved in the day-to-day operations of the company.

    (d)  **<u>GAAP Violations</u>**

    (i)  The restatement confirms that the Company committed significant violations of GAAP.  *See* ¶¶110-118; and

    (ii)  When significant GAAP violations are described with particularity, they provide powerful indirect evidence of scienter.

**Statement 3: 2Q11 Earnings Release and Form 10-Q**

54. On May 10, 2011, the Company issued a press release announcing its financial results for the second quarter of fiscal year 2011 ended March 31, 2011.  For the quarter, the Company reported net income of $15.4 million, or $0.81 diluted EPS and total operating revenues of $113 million, compared to net income of $7.4 million, or $0.41 diluted EPS and total operating revenues of $65.3 million for the same period a year ago.  The same day, the Company filed a quarterly report for the period ended March 31, 2011 on a Form 10-Q with the SEC signed by Defendants O'Connor and Dunaway, which reiterated the Company's previously reported financial results and financial position.  The Company stated that its financial statements were prepared in accordance with GAAP.

55. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway, stating that the financial information contained in the Form 10-Q was accurate, the Company's internal controls were effective, and disclosed any material changes to the Company's internal control over financial reporting.

**Falsity of Statement 3**

56.     The statements in ¶¶54-55 were materially false and misleading at the time they were made because, as Defendants themselves admitted in the restatement:

(a)     INTL FCStone overstated revenues in trading gains of up to $10.2 million, causing an overstatement of net income for fiscal year 2011 of $2.5 million (which caused an annual impact on net income for 2011 of -7%), and a cumulative overstatement of net income of $5.9 million during the Class Period;

(b)     INTL FCStone's financial statements, and other financial information included in the Form 10-Q, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-Q;

(c)     INTL FCStone's financial statements, and other financial information included in the Form 10-Q, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-Q;

(d)     the Individual Defendants failed to adequately design disclosure controls and procedures, or failed to cause such disclosure controls and procedures to be designed under their supervision, to ensure that material information regarding the Company was made known to them by others within the Company;

(e)     the Individual Defendants failed to adequately design internal controls over financial reporting, or failed to cause such internal controls over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP;

(f)     the Individual Defendants failed to adequately evaluate the effectiveness of the Company's disclosure controls and procedures;

(g)     the Individual Defendants falsely presented in the Form 10-Q their conclusions about the effectiveness of the Company's disclosure controls and procedures;

(h)     the Form 10-Q did not fully comply with the requirements of Section 13(a) or 15(d) of the Exchange Act;

(i)     INTL FCStone's financial statements were not prepared in accordance with GAAP or the Company's own stated accounting policies, as detailed in ¶¶110-118; and

(j)     INTL FCStone's internal controls were materially deficient, as detailed in ¶109.

**Defendants' Contemporaneous Reckless Disregard of the Falsity of Statement 3**

57.     The following facts, viewed holistically, establish Defendants' scienter with respect to the false statements contained in ¶¶54-55:

      (a)      **Defendants Ignored Critical Red Flags that Put Them on Notice that the Company Was Vulnerable to False Financial Statements and Control Deficiencies**

          (i)      Defendants knew the Company had just completed the transformational FCStone merger;

          (ii)      Defendants knew the Company completed six additional key acquisitions in the span of just twelve months;

          (iii)      Defendants knew the Company had just nearly doubled its customer count;

          (iv)      Defendants knew that the Company just engaged in a geographic expansion to South America, Europe and Asia;

          (v)      Defendants knew that the Company's employee headcount had increased by 59%; and

          (vi)      Defendants knew that they expedited the growth of the Company far in excess of what they had originally planned.

      (b)      **The Individual Defendants Failed to Check Information They Had a Duty to Monitor**

          (i)      The Individual Defendants had a statutory duty to monitor the Company's internal controls pursuant to SOX, and their failure to check information they had a duty to monitor constitutes recklessness;

          (ii)      The Individual Defendants falsely certified the Company's internal controls pursuant to SOX;

          (iii)      The Individual Defendants admittedly: (1) were personally responsible for establishing and maintaining INTL FCStone's internal controls over financial reporting; and (2) personally designed such internal controls over financial reporting, or caused such controls over financial reporting to be designed under their supervision; and

          (iv)      As evidenced by the restatement, the Company did not design or maintain effective internal controls.

(c)      **Core Operations Doctrine**

(i)      During the Class Period, there was nothing more central to INTL FCStone's core operations than the Commodity and Risk Management division, into which Hanley was integrated after its acquisition;

(ii)      Prior to the Hanley acquisition in July 2010, the revenues from Commodity and Risk Management accounted for 40% of the Company's net revenues. After the Hanley acquisition, Commodity and Risk Management's contribution to the Company's net revenues increased significantly, *see* ¶121, culminating in that segment contributing as much as 64% of total net revenues during the third quarter of 2011;

(iii)      Because the Hanley segment and its operations were indisputably a significant part of INTL FCStone, knowledge of the problems with Hanley's accounting are properly imputed to Defendants; and

(iv)      Where the accounting irregularities relate to accounting practices that are sufficiently critical to the core operations of the company, knowledge of the accounting improprieties are properly imputed to the company's officers and directors who are involved in the day-to-day operations of the company.

(d)      **GAAP Violations**

(i)      The restatement confirms that the Company committed significant violations of GAAP. *See* ¶¶110-118; and

(ii)      When significant GAAP violations are described with particularity, they provide powerful indirect evidence of scienter.

**Statement 4: 3Q11 Earnings Release, Form 10-Q and Conference Call**

58.      On August 9, 2011, the Company issued a press release announcing its financial results for the third quarter of fiscal year 2011 ended June 30, 2011. For the quarter, the Company reported net income of $10.4 million, or $0.55 diluted EPS and total operating revenues of $105.4 million, compared to net income of $6.7 million, or $0.38 diluted EPS and total operating revenues of $78.2 million for the same period a year ago. The same day, the Company filed a quarterly report for the period ended June 30, 2011 on a Form 10-Q with the SEC signed by Defendants O'Connor and Dunaway, which reiterated the Company's previously

reported financial results and financial position.   The Company stated that its financial statements were prepared in accordance with GAAP.

59.     In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway, stating that the financial information contained in the Form 10-Q was accurate, the Company's internal controls were effective, and disclosed any material changes to the Company's internal control over financial reporting.

60.     On August 10, 2011, the Company held a conference call with analysts and investors to discuss the Company's earnings and operations.   Defendant O'Connor acknowledged that the Hanley business had been overwhelmed by Defendants' attempt to roll out Hanley's capabilities to the Company's 8,000 commercial customers, but denied the existence of integration problems with the Hanley acquisition.   O'Connor stated, in pertinent part, as follows:

**Bill Jones** - Singular Research - Analyst

I think you've already answered some of my questions, but maybe you can give a little more color on the integration process with Provident and some of the others and where we are with that.

**Sean O'Connor** - INTL FCStone Inc. - CEO

*In terms of integration, I think it's going really well*.   Both *with Hanley* and Provident, the concept was to take those capabilities and roll them out to our 8,000 commercial customers.    *In both instances we have pretty quickly overwhelmed both of those businesses.   They put their hands up early on and said, enough already, let us deal with what we've got on our plates*.

*The problem there a little bit is not so much of integration, but of capacity*.   What we need to do is build additional capacity in both of those businesses and we've certainly done that in Provident.   That's one of the reasons we have higher costs and our Securities segments aren't performing.

Part of our game plan is to grow their capacity and to get a lot more people in to handle a besieged flow.  And it's coming through.  ***I think it's more a capacity issue than an integration problem***.[4]

**Falsity of Statement 4**

61.     The statements in ¶¶58-60 were materially false and misleading at the time they were made because, as Defendants themselves admitted in the restatement:

(a)     INTL FCStone overstated revenues in trading gains of up to $10.2 million, causing an overstatement of net income for fiscal year 2011 of $2.5 million (which caused an annual impact on net income for 2011 of -7%), and a cumulative overstatement of net income of $5.9 million during the Class Period;

(b)     INTL FCStone's financial statements, and other financial information included in the Form 10-Q, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-Q;

(c)     INTL FCStone's financial statements, and other financial information included in the Form 10-Q, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-Q;

(d)     the Individual Defendants failed to adequately design disclosure controls and procedures, or failed to cause such disclosure controls and procedures to be designed under their supervision, to ensure that material information regarding the Company was made known to them by others within the Company;

(e)     the Individual Defendants failed to adequately design internal controls over financial reporting, or failed to cause such internal controls over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP;

(f)     the Individual Defendants failed to adequately evaluate the effectiveness of the Company's disclosure controls and procedures;

(g)     the Individual Defendants falsely presented in the Form 10-Q their conclusions about the effectiveness of the Company's disclosure controls and procedures;

(h)     the Form 10-Q did not fully comply with the requirements of Section 13(a) or 15(d) of the Exchange Act;

---

[4]     All emphasis is added unless otherwise specified.

(i)     INTL FCStone's financial statements were not prepared in accordance with GAAP or the Company's own stated accounting policies, as detailed in ¶¶110-118; and

(j)     INTL FCStone's internal controls were materially deficient, as detailed in ¶109.

(k)     there were severe integration issues associated with the Hanley acquisition that resulted in the restatement.

**Defendants' Contemporaneous Reckless Disregard of the Falsity of Statement 4**

62.     The following facts, viewed holistically, establish Defendants' scienter with respect to the false statements contained in ¶¶58-60:

(a)     **Defendants Ignored Critical Red Flags that Put Them on Notice that the Company Was Vulnerable to False Financial Statements and Control Deficiencies**

(i)     Defendants knew they had overwhelmed the Hanley business to the point that the Hanley personnel could not handle the roll-out of its capabilities to the Company's 8,000 commercial customers;

(ii)     Defendants knew the Company had just completed the transformational FCStone merger;

(iii)     Defendants knew the Company completed six additional key acquisitions in the span of just twelve months;

(iv)     Defendants knew the Company had just nearly doubled its customer count;

(v)     Defendants knew that the Company just engaged in a geographic expansion to South America, Europe and Asia;

(vi)     Defendants knew that the Company's employee headcount had increased by 59%; and

(vii)     Defendants knew that they expedited the growth of the Company far in excess of what they had originally planned.

(b)     **The Individual Defendants Failed to Check Information They Had a Duty to Monitor**

(i)     The Individual Defendants had a statutory duty to monitor the Company's internal controls pursuant to SOX, and their failure to check information they had a duty to monitor constitutes recklessness;

(ii)     The Individual Defendants falsely certified the Company's internal controls pursuant to SOX;

(iii)     The Individual Defendants admittedly: (1) were personally responsible for establishing and maintaining INTL FCStone's internal controls over financial reporting; and (2) personally designed such internal controls over financial reporting, or caused such controls over financial reporting to be designed under their supervision; and

(iv)     As evidenced by the restatement, the Company did not maintain effective internal controls.

(c)     **Core Operations Doctrine**

(i)     During the Class Period, there was nothing more central to INTL FCStone's core operations than the Commodity and Risk Management division, into which Hanley was integrated after its acquisition;

(ii)     Prior to the Hanley acquisition in July 2010, the revenues from Commodity and Risk Management accounted for 40% of the Company's net revenues.  After the Hanley acquisition, Commodity and Risk Management's contribution to the Company's net revenues increased significantly, *see* ¶121, culminating in that segment contributing as much as 64% of total net revenues during the third quarter of 2011;

(iii)     Because the Hanley segment and its operations were indisputably a significant part of INTL FCStone, knowledge of the problems with Hanley's accounting are properly imputed to Defendants; and

(iv)     Where the accounting irregularities relate to accounting practices that are sufficiently critical to the core operations of the company, knowledge of the accounting improprieties are properly imputed to the company's officers and directors who are involved in the day-to-day operations of the company.

(d)     **GAAP Violations**

(i)     The restatement confirms that the Company committed significant violations of GAAP.  *See* ¶¶110-118; and

(ii)     When significant GAAP violations are described with particularity, they provide powerful indirect evidence of scienter.

**Statement 5: Fiscal Year 2011 Earnings Release and Form 10-K**

63.     On December 13, 2011, the Company issued a press release announcing its financial results for the fourth quarter and fiscal year 2011 ended September 30, 2011.  For the quarter, the Company reported net income of $7.5 million, or $0.39 diluted EPS and total

operating revenues of $108.1 million, compared to a net loss of $4.5 million, or ($0.26) diluted

EPS and total operating revenues of $65.9 million for the same period a year ago.  For the fiscal

year, the Company reported net income of $37.3 million, or $1.96 diluted EPS and total

operating revenues of $423.2 million, compared to net income of $5.4 million, or $0.30 diluted

EPS and total operating revenues of $269 million for the same period a year ago.  On December

14, 2011, the Company filed an annual report for the year ended September 30, 2011 on a Form

10-K with the SEC signed by, among others, Defendants O'Connor and Dunaway, which

reiterated the Company's previously reported financial results and financial position.   The

Company stated that its financial statements were prepared in accordance with GAAP.

64.     In addition, the Form 10-K contained signed certifications pursuant to SOX by

Defendants O'Connor and Dunaway, stating that the financial information contained in the Form

10-K was accurate, the Company's internal controls were effective, and disclosed any material

changes to the Company's internal control over financial reporting.

**Falsity of Statement 5**

65.     The statements in ¶¶63-64 were materially false and misleading at the time they

were made because, as Defendants themselves admitted in the restatement:

(a)     INTL FCStone overstated revenues in trading gains of up to $10.2 million,
causing an overstatement of net income for fiscal year 2011 of $2.5 million (which caused an
annual impact on net income for 2011 of -7%), and a cumulative overstatement of net income of
$5.9 million during the Class Period;

(b)     INTL FCStone's financial statements, and other financial information
included in the Form 10-K, did not fairly present in all material respects the financial condition,
results of operations and cash flows of the Company as of, and for, the periods presented in the
Form 10-K;

(c)     INTL FCStone's financial statements, and other financial information
included in the Form 10-K, did not fairly present in all material respects the financial condition,
results of operations and cash flows of the Company as of, and for, the periods presented in the
Form 10-K;

(d)     the Individual Defendants failed to adequately design disclosure controls and procedures, or failed to cause such disclosure controls and procedures to be designed under their supervision, to ensure that material information regarding the Company was made known to them by others within the Company;

(e)     the Individual Defendants failed to adequately design internal controls over financial reporting, or failed to cause such internal controls over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP;

(f)     the Individual Defendants failed to adequately evaluate the effectiveness of the Company's disclosure controls and procedures;

(g)     the Individual Defendants falsely presented in the Form 10-K their conclusions about the effectiveness of the Company's disclosure controls and procedures;

(h)     the Form 10-K did not fully comply with the requirements of Section 13(a) or 15(d) of the Exchange Act;

(i)     INTL FCStone's financial statements were not prepared in accordance with GAAP or the Company's own stated accounting policies, as detailed in ¶¶110-118; and

(j)     INTL FCStone's internal controls were materially deficient, as detailed in ¶109.

**Defendants' Contemporaneous Reckless Disregard of the Falsity of Statement 5**

66.     The following facts, viewed holistically, establish Defendants' scienter with respect to the false statements contained in ¶¶63-64:

(a)     **Defendants Ignored Critical Red Flags that Put Them on Notice that the Company Was Vulnerable to False Financial Statements and Control Deficiencies**

(i)     Defendants knew they had overwhelmed the Hanley business to the point that the Hanley personnel could not handle the roll-out of its capabilities to the Company's 8,000 commercial customers;

(ii)     Defendants knew the Company had just completed the transformational FCStone merger;

(iii)     Defendants knew the Company completed six additional key acquisitions in the span of just twelve months;

(iv)     Defendants knew the Company had just nearly doubled its customer count;

(v)      Defendants knew that the Company just engaged in a geographic expansion to South America, Europe and Asia;

(vi)      Defendants knew that the Company's employee headcount had increased by 59%; and

(vii)      Defendants knew that they expedited the growth of the Company far in excess of what they had originally planned.

(b)      **The Individual Defendants Failed to Check Information They Had a Duty to Monitor**

(i)      The Individual Defendants had a statutory duty to monitor the Company's internal controls pursuant to SOX, and their failure to check information they had a duty to monitor constitutes recklessness;

(ii)      The Individual Defendants falsely certified the Company's internal controls pursuant to SOX;

(iii)      The Individual Defendants admittedly: (1) were personally responsible for establishing and maintaining INTL FCStone's internal controls over financial reporting; and (2) personally designed such internal controls over financial reporting, or caused such controls over financial reporting to be designed under their supervision; and

(iv)      As evidenced by the restatement, the Company did not maintain effective internal controls.

(c)      **Core Operations Doctrine**

(i)      During the Class Period, there was nothing more central to INTL FCStone's core operations than the Commodity and Risk Management division, into which Hanley was integrated after its acquisition;

(ii)      Prior to the Hanley acquisition in July 2010, the revenues from Commodity and Risk Management accounted for 40% of the Company's net revenues. After the Hanley acquisition, Commodity and Risk Management's contribution to the Company's net revenues increased significantly, *see* ¶121;

(iii)      Because the Hanley segment and its operations were indisputably a significant part of INTL FCStone, knowledge of the problems with Hanley's accounting are properly imputed to Defendants; and

(iv)      Where the accounting irregularities relate to accounting practices that are sufficiently critical to the core operations of the company, knowledge of the accounting improprieties are properly imputed to the company's officers and directors who are involved in the day-to-day operations of the company.

(d)      **GAAP Violations**

(i)      The restatement confirms that the Company committed significant violations of GAAP.  *See* ¶¶110-118; and

(ii)      When significant GAAP violations are described with particularity, they provide powerful indirect evidence of scienter.

**The February 9, 2012 Partial Disclosure**

67.      On February 9, 2012, the Company held a conference call with analysts and investors to discuss its first quarter 2012 performance.  During the conference call, the Company discussed various critical issues such as slowing revenue streams, falling volume in the commodities market, and overall lack of a clear and compelling business model.

68.      Defendant Dunaway explained that adjusted operating revenues in the Commodity and Risk Management Services segment declined 29% as compared to the prior-year period, while every other segment of the Company experienced growth in adjusted operating revenues in the first quarter of fiscal year 2011.

69.      Defendant O'Connor attributed the $20 million revenue shortfall in the Commodity and Risk Management Services segment to "a number of external factors," including "an extremely challenging market environment in our commodities area," while the Company's "other segments all showed some growth in revenues."  However, as highlighted by the Company's and analysts' comments during the call, these issues arose principally as a result of the Company's rapid acquisition strategy, and until that point had been masked by favorable market conditions.

70.      For example, Defendant O'Connor and Scott Branch, the Company's Chief Operating Officer ("COO") provided the following responses to an analyst's questions about INTL FCStone's declining revenues per employee:

**Bill Jones** - Singular Research - Analyst

And in terms of [changers], do you see any at all on *revenues per employee or any of the other financial targets that you generally look for*?

*        *        *

**Sean O'Connor** - INTL FCStone, Inc. - CEO

Bill, *to answer your question, I guess your argument was that if the consultants are going up, but the customers aren't going up, how do the metrics look on revenue, I guess per head, per sales person, per customer? Is that your question*?

**Bill Jones** - Singular Research - Analyst

Yes, just trying to get a feel for that, how that changes or maybe it doesn't.

**Sean O'Connor** - INTL FCStone, Inc. - CEO

*The answer is bad and bad.   (Laughter) We've got more people, more customers, and less revenue, so it's sort of easy math*.  Without trying to state the obvious, I guess the real issue is --

**Bill Jones** - Singular Research - Analyst

Well, I'm thinking more longer term.

**Sean O'Connor** - INTL FCStone, Inc. - CEO

*More longer term, yes.  I mean, we've got a lot of people we brought on.  I mean, if you look, for example, on the LME team, we have actually accepted into our system 800 new customers.  Those customers aren't yet dealing with us. We think they will deal with us.  We have 50 new sales people.  And we don't have a lot of revenue coming out of that business.   So that really skews the metrics.  And I think that same math is applied to Provident, is applied to the Ambrian people we've hired, is applied elsewhere through the organization*.

So in the short term, given the pace of growth and the opportunity which we decided to jump on, *we've got a lot of our management metrics that we really work hard on are going in the wrong direction*.  Long term, I think it's easily conceivable that we would get back to all of the objectives we hold.  Clearly we need some help from the market.  But I would say by fiscal year end we should be pretty close to hitting all our marks, given normal market conditions and all of this.  And if you do that math, that's a significantly larger business than the business we have now in terms of revenues and bottom line.

*        *        *

- 33 -

**Scott Branch** - INTL FCStone, Inc. - COO

And one thing I would add on that is, for those of you familiar with the Company, Q1 2011 was a knockout year for us.  We said that at the time.  And that was an exceptionally positive year that we're comparing against.  So i[f] you look at the revenue per head and the big drop down, it's not only that *we've got more heads to distribute that revenue over and some of those aren't producing*, but we're comparing against a very good quarter.

*       *       *

**Sean O'Connor** - INTL FCStone, Inc. - CEO

*I mean, the problem really is in a lot of these things, yes, because we try and buy businesses cost effectively and without paying a lot of premium and without a lot of risk, sometimes the tradeoff of that is we acquire a team instead of a going concern and so on.  And the problem with that is you get the costs day one.  And the revenues take 6, 12 months to build out.  And you've got to live with that in the meanwhile*.  And up until now we've had good market conditions.

*So while we've been adding things continuously the market conditions have been good enough that it wasn't really apparent that we had a lot of businesses that were not performing.  Now the market's turned around, this kind of looks pretty stark right now because you can see the increase in costs, a lot of these new businesses not yet performing*.  And we think they will, so patience, I guess.

71.    On this news, the price of INTL FCStone stock fell $3.94 per share, or 14%, to close on February 9, 2012 at $22.54 per share.

72.    In a February 20, 2012 research report following the February 9 earnings call, the Singular Research analyst who questioned the Company's declining revenue per employee during the call, wrote: "Another key metric is to maintain $500,000 or more of annualized revenue per employee.  INTL achieved adjusted revenue of only $387,126 per employee in Q1:12 vs. $579,674 in Q1:11[.]"

73.    Nevertheless, Defendants continued to recklessly conceal the falsity of the Company's financial statements and the Individual Defendants' SOX Certifications.

- 34 -

**Statement 6: 1Q12 Earnings Release and Form 10-Q**

74.     On February 8, 2012, the Company issued a press release announcing its financial results for the first quarter of fiscal year 2012 ended December 31, 2011.  For the quarter, the Company reported a net loss of $400,000, or ($0.02) diluted EPS and total operating revenues of $96.3 million, compared to net income of $4 million, or $0.22 diluted EPS and total operating revenues of $96.7 million for the same period a year ago.  (This represented a $20 million decline in revenues from the same period a year earlier.)  The same day, the Company filed a quarterly report for the period ended December 31, 2011 on a Form 10-Q with the SEC signed by Defendants O'Connor and Dunaway, which reiterated the Company's previously reported financial results and financial position.  The Company stated that its financial statements were prepared in accordance with GAAP.

75.     In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway, stating that the financial information contained in the Form 10-Q was accurate, the Company's internal controls were effective, and disclosed any material changes to the Company's internal control over financial reporting.

**Falsity of Statement 6**

76.     The statements in ¶¶74-75 were materially false and misleading at the time they were made because, as Defendants themselves admitted in the restatement:

(a)     INTL FCStone overstated revenues in trading gains of up to $10.2 million, causing an overstatement of net income for fiscal year 2012 of $2.2 million (which caused an annual impact on net income for 2012 of -15%), and a cumulative overstatement of net income of $5.9 million during the Class Period;

(b)     INTL FCStone's financial statements, and other financial information included in the Form 10-Q, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-Q;

- 35 -

(c)     INTL FCStone's financial statements, and other financial information included in the Form 10-Q, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-Q;

(d)     the Individual Defendants failed to adequately design disclosure controls and procedures, or failed to cause such disclosure controls and procedures to be designed under their supervision, to ensure that material information regarding the Company was made known to them by others within the Company;

(e)     the Individual Defendants failed to adequately design internal controls over financial reporting, or failed to cause such internal controls over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP;

(f)     the Individual Defendants failed to adequately evaluate the effectiveness of the Company's disclosure controls and procedures;

(g)     the Individual Defendants falsely presented in the Form 10-Q their conclusions about the effectiveness of the Company's disclosure controls and procedures;

(h)     the Form 10-Q did not fully comply with the requirements of Section 13(a) or 15(d) of the Exchange Act;

(i)     INTL FCStone's financial statements were not prepared in accordance with GAAP or the Company's own stated accounting policies, as detailed in ¶¶110-118; and

(j)     INTL FCStone's internal controls were materially deficient, as detailed in ¶109.

**Defendants' Contemporaneous Reckless Disregard of the Falsity of Statement 6**

77.     The following facts, viewed holistically, establish Defendants' scienter with respect to the false statements contained in ¶¶74-75:

(a)     **Defendants Ignored Critical Red Flags that Put Them on Notice that the Company Was Vulnerable to False Financial Statements and Control Deficiencies**

(i)     Defendants knew they had overwhelmed the Hanley business to the point that the Hanley personnel could not handle the roll-out of its capabilities to the Company's 8,000 commercial customers;

(ii)     Defendants knew the Company had just completed the transformational FCStone merger;

(iii)     Defendants knew the Company completed six additional key acquisitions in the span of just twelve months;

(iv)     Defendants knew the Company had just nearly doubled its customer count;

(v)     Defendants knew that the Company just engaged in a geographic expansion to South America, Europe and Asia;

(vi)     Defendants knew that the Company's employee headcount had increased by 59%; and

(vii)     Defendants knew that they expedited the growth of the Company far in excess of what they had originally planned.

(b)     **The Individual Defendants Failed to Check Information They Had a Duty to Monitor**

(i)     The Individual Defendants had a statutory duty to monitor the Company's internal controls pursuant to SOX, and their failure to check information they had a duty to monitor constitutes recklessness;

(ii)     The Individual Defendants falsely certified the Company's internal controls pursuant to SOX;

(iii)     The Individual Defendants admittedly: (1) were personally responsible for establishing and maintaining INTL FCStone's internal controls over financial reporting; and (2) personally designed such internal controls over financial reporting, or caused such controls over financial reporting to be designed under their supervision; and

(iv)     As evidenced by the restatement, the Company did not maintain effective internal controls.

(c)     **Core Operations Doctrine**

(i)     During the Class Period, there was nothing more central to INTL FCStone's core operations than the Commodity and Risk Management division, into which Hanley was integrated after its acquisition;

(ii)     Prior to the Hanley acquisition in July 2010, the revenues from Commodity and Risk Management accounted for 40% of the Company's net revenues.  After the Hanley acquisition, Commodity and Risk Management's contribution to the Company's net revenues increased significantly, *see* ¶121;

(iii)     Because the Hanley segment and its operations were indisputably a significant part of INTL FCStone, knowledge of the problems with Hanley's accounting are properly imputed to Defendants; and

(iv)     Where the accounting irregularities relate to accounting practices that are sufficiently critical to the core operations of the company, knowledge of the accounting improprieties are properly imputed to the company's officers and directors who are involved in the day-to-day operations of the company.

(d)     **GAAP Violations**

(i)     The restatement confirms that the Company committed significant violations of GAAP.  *See* ¶¶110-118; and

(ii)     When significant GAAP violations are described with particularity, they provide powerful indirect evidence of scienter.

**Statement 7: 2Q12 Earnings Release and Form 10-Q**

78.     On May 9, 2012, the Company issued a press release announcing its financial results for the second quarter of fiscal year 2012 ended March 31, 2012.  For the quarter, the Company reported net income of $2.4 million, or $0.12 diluted EPS and total operating revenues of $119.6 million, compared to net income of $15.4 million, or $0.81 diluted EPS and total operating revenues of $113 million for the same period a year ago.  The same day, the Company filed a quarterly report for the period ended March 31, 2012 on a Form 10-Q with the SEC signed by Defendants O'Connor and Dunaway, which reiterated the Company's previously reported financial results and financial position.   The Company stated that its financial statements were prepared in accordance with GAAP.

79.     In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway, stating that the financial information contained in the Form 10-Q was accurate, the Company's internal controls were effective, and disclosed any material changes to the Company's internal control over financial reporting.

**Falsity of Statement 7**

80.     The statements in ¶¶78-79 were materially false and misleading at the time they were made because, as Defendants themselves admitted in the restatement:

(a)      INTL FCStone overstated revenues in trading gains of up to $10.2 million, causing an overstatement of net income for fiscal year 2012 of $2.2 million (which caused an annual impact on net income for 2012 of -15%), and a cumulative overstatement of net income of $5.9 million during the Class Period;

(b)      INTL FCStone's financial statements, and other financial information included in the Form 10-Q, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-Q;

(c)      INTL FCStone's financial statements, and other financial information included in the Form 10-Q, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-Q;

(d)      the Individual Defendants failed to adequately design disclosure controls and procedures, or failed to cause such disclosure controls and procedures to be designed under their supervision, to ensure that material information regarding the Company was made known to them by others within the Company;

(e)      the Individual Defendants failed to adequately design internal controls over financial reporting, or failed to cause such internal controls over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP;

(f)      the Individual Defendants failed to adequately evaluate the effectiveness of the Company's disclosure controls and procedures;

(g)      the Individual Defendants falsely presented in the Form 10-Q their conclusions about the effectiveness of the Company's disclosure controls and procedures;

(h)      the Form 10-Q did not fully comply with the requirements of Section 13(a) or 15(d) of the Exchange Act;

(i)      INTL FCStone's financial statements were not prepared in accordance with GAAP or the Company's own stated accounting policies, as detailed in ¶¶110-118; and

(j)      INTL FCStone's internal controls were materially deficient, as detailed in ¶109.

**Defendants' Contemporaneous Reckless Disregard of the Falsity of Statement 7**

81.      The following facts, viewed holistically, establish Defendants' scienter with respect to the false statements contained in ¶¶78-79:

- 39 -

      (a)      **Defendants Ignored Critical Red Flags that Put
Them on Notice that the Company Was Vulnerable
to False Financial Statements and Control Deficiencies**

      (i)      Defendants knew they had overwhelmed the Hanley business to the point that the Hanley personnel could not handle the roll-out of its capabilities to the Company's 8,000 commercial customers;

      (ii)      Defendants knew the Company had just completed the transformational FCStone merger;

      (iii)      Defendants knew the Company completed six additional key acquisitions in the span of just twelve months;

      (iv)      Defendants knew the Company had just nearly doubled its customer count;

      (v)      Defendants knew that the Company just engaged in a geographic expansion to South America, Europe and Asia;

      (vi)      Defendants knew that the Company's employee headcount had increased by 59%; and

      (vii)      Defendants knew that they expedited the growth of the Company far in excess of what they had originally planned.

      (b)      **The Individual Defendants Failed to
Check Information They Had a Duty to Monitor**

      (i)      The Individual Defendants had a statutory duty to monitor the Company's internal controls pursuant to SOX, and their failure to check information they had a duty to monitor constitutes recklessness;

      (ii)      The Individual Defendants falsely certified the Company's internal controls pursuant to SOX;

      (iii)      The Individual Defendants admittedly: (1) were personally responsible for establishing and maintaining INTL FCStone's internal controls over financial reporting; and (2) personally designed such internal controls over financial reporting, or caused such controls over financial reporting to be designed under their supervision; and

      (iv)      As evidenced by the restatement, the Company did not maintain effective internal controls.

(c)      **Core Operations Doctrine**

(i)      During the Class Period, there was nothing more central to INTL FCStone's core operations than the Commodity and Risk Management division, into which Hanley was integrated after its acquisition;

(ii)      Prior to the Hanley acquisition in July 2010, the revenues from Commodity and Risk Management accounted for 40% of the Company's net revenues.  After the Hanley acquisition, Commodity and Risk Management's contribution to the Company's net revenues increased significantly, *see* ¶121;

(iii)      Because the Hanley segment and its operations were indisputably a significant part of INTL FCStone, knowledge of the problems with Hanley's accounting are properly imputed to Defendants; and

(iv)      Where the accounting irregularities relate to accounting practices that are sufficiently critical to the core operations of the company, knowledge of the accounting improprieties are properly imputed to the company's officers and directors who are involved in the day-to-day operations of the company.

(d)      **GAAP Violations**

(i)      The restatement confirms that the Company committed significant violations of GAAP.  *See* ¶¶110-118; and

(ii)      When significant GAAP violations are described with particularity, they provide powerful indirect evidence of scienter.

**Statement 8: 3Q12 Earnings Release and Form 10-Q**

82.      On August 8, 2012, the Company issued a press release announcing its financial results for the third quarter of fiscal year 2012 ended June 30, 2012.  For the quarter, the Company reported net income of $4.7 million, or $0.23 diluted EPS and total operating revenues of $123.8 million, compared to net income of $10.4 million, or $0.55 diluted EPS and total operating revenues of $105.4 million for the same period a year ago.  The same day, the Company filed a quarterly report for the period ended June 30, 2012 on a Form 10-Q with the SEC signed by Defendants O'Connor and Dunaway, which reiterated the Company's previously reported financial results and financial position.  The Company stated that its financial statements were prepared in accordance with GAAP.

83.     In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway, stating that the financial information contained in the Form 10-Q was accurate, the Company's internal controls were effective, and disclosed any material changes to the Company's internal control over financial reporting.

**Falsity of Statement 8**

84.     The statements in ¶¶82-83 were materially false and misleading at the time they were made because, as Defendants themselves admitted in the restatement:

(a)     INTL FCStone overstated revenues in trading gains of up to $10.2 million, causing an overstatement of net income for fiscal year 2012 of $2.2 million (which caused an annual impact on net income for 2012 of -15%), and a cumulative overstatement of net income of $5.9 million during the Class Period;

(b)     INTL FCStone's financial statements, and other financial information included in the Form 10-Q, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-Q;

(c)     INTL FCStone's financial statements, and other financial information included in the Form 10-Q, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-Q;

(d)     the Individual Defendants failed to adequately design disclosure controls and procedures, or failed to cause such disclosure controls and procedures to be designed under their supervision, to ensure that material information regarding the Company was made known to them by others within the Company;

(e)     the Individual Defendants failed to adequately design internal controls over financial reporting, or failed to cause such internal controls over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP;

(f)     the Individual Defendants failed to adequately evaluate the effectiveness of the Company's disclosure controls and procedures;

(g)     the Individual Defendants falsely presented in the Form 10-Q their conclusions about the effectiveness of the Company's disclosure controls and procedures;

(h)     the Form 10-Q did not fully comply with the requirements of Section 13(a) or 15(d) of the Exchange Act;

- 42 -

(i)     INTL FCStone's financial statements were not prepared in accordance with GAAP or the Company's own stated accounting policies, as detailed in ¶¶110-118; and

(j)     INTL FCStone's internal controls were materially deficient, as detailed in ¶109.

**Defendants' Contemporaneous Reckless Disregard of the Falsity of Statement 8**

85.    The following facts, viewed holistically, establish Defendants' scienter with respect to the false statements contained in ¶¶82-83:

(a)    **Defendants Ignored Critical Red Flags that Put
Them on Notice that the Company Was Vulnerable
to False Financial Statements and Control Deficiencies**

(i)    Defendants knew they had overwhelmed the Hanley business to the point that the Hanley personnel could not handle the roll-out of its capabilities to the Company's 8,000 commercial customers;

(ii)    Defendants knew the Company had just completed the transformational FCStone merger;

(iii)    Defendants knew the Company completed six additional key acquisitions in the span of just twelve months;

(iv)    Defendants knew the Company had just nearly doubled its customer count;

(v)    Defendants knew that the Company just engaged in a geographic expansion to South America, Europe and Asia;

(vi)    Defendants knew that the Company's employee headcount had increased by 59%; and

(vii)    Defendants knew that they expedited the growth of the Company far in excess of what they had originally planned.

(b)    **The Individual Defendants Failed to
Check Information They Had a Duty to Monitor**

(i)    The Individual Defendants had a statutory duty to monitor the Company's internal controls pursuant to SOX, and their failure to check information they had a duty to monitor constitutes recklessness;

(ii)    The Individual Defendants falsely certified the Company's internal controls pursuant to SOX;

(iii)     The Individual Defendants admittedly: (1) were personally responsible for establishing and maintaining INTL FCStone's internal controls over financial reporting; and (2) personally designed such internal controls over financial reporting, or caused such controls over financial reporting to be designed under their supervision; and

(iv)     As evidenced by the restatement, the Company did not maintain effective internal controls.

(c)     **Core Operations Doctrine**

(i)     During the Class Period, there was nothing more central to INTL FCStone's core operations than the Commodity and Risk Management division, into which Hanley was integrated after its acquisition;

(ii)     Prior to the Hanley acquisition in July 2010, the revenues from Commodity and Risk Management accounted for 40% of the Company's net revenues. After the Hanley acquisition, Commodity and Risk Management's contribution to the Company's net revenues increased significantly, *see* ¶121;

(iii)     Because the Hanley segment and its operations were indisputably a significant part of INTL FCStone, knowledge of the problems with Hanley's accounting are properly imputed to Defendants; and

(iv)     Where the accounting irregularities relate to accounting practices that are sufficiently critical to the core operations of the company, knowledge of the accounting improprieties are properly imputed to the company's officers and directors who are involved in the day-to-day operations of the company.

(d)     **GAAP Violations**

(i)     The restatement confirms that the Company committed significant violations of GAAP. *See* ¶¶110-118; and

(ii)     When significant GAAP violations are described with particularity, they provide powerful indirect evidence of scienter.

**Statement 9: Fiscal Year 2012 Earnings Release and Form 10-K**

86.     On December 12, 2012, the Company issued a press release announcing its financial results for the fourth quarter and fiscal year 2012 ended September 30, 2012. For the quarter, the Company reported net income of $8.3 million, or $0.42 diluted EPS and total operating revenues of $118 million, compared to net income of $7.5 million, or $0.39 diluted EPS and total operating revenues of $108.1 million for the same period a year ago. For the fiscal

year, the Company reported net income of $15 million, or $0.75 diluted EPS and total operating revenues of $457.7 million, compared to net income of $37.3 million, or $1.96 diluted EPS and total operating revenues of $423.2 million for the same period a year ago.  The same day, the Company filed an annual report for the year ended September 30, 2012 on a Form 10-K with the SEC signed by, among others, Defendants O'Connor and Dunaway, which reiterated the Company's previously reported financial results and financial position.  The Company stated that its financial statements were prepared in accordance with GAAP.

87.    In addition, the Form 10-K contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway, stating that the financial information contained in the Form 10-K was accurate, the Company's internal controls were effective, and disclosed any material changes to the Company's internal control over financial reporting.

**Falsity of Statement 9**

88.    The statements in ¶¶86-87 were materially false and misleading at the time they were made because, as Defendants themselves admitted in the restatement:

(a)    INTL FCStone overstated revenues in trading gains of up to $10.2 million, causing an overstatement of net income for fiscal year 2012 of $2.2 million (which caused an annual impact on net income for 2012 of -15%), and a cumulative overstatement of net income of $5.9 million during the Class Period;

(b)    INTL FCStone's financial statements, and other financial information included in the Form 10-K, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-K;

(c)    INTL FCStone's financial statements, and other financial information included in the Form 10-K, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-K;

(d)    the Individual Defendants failed to adequately design disclosure controls and procedures, or failed to cause such disclosure controls and procedures to be designed under their supervision, to ensure that material information regarding the Company was made known to them by others within the Company;

- 45 -

(e)　　the Individual Defendants failed to adequately design internal controls over financial reporting, or failed to cause such internal controls over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP;

(f)　　the Individual Defendants failed to adequately evaluate the effectiveness of the Company's disclosure controls and procedures;

(g)　　the Individual Defendants falsely presented in the Form 10-K their conclusions about the effectiveness of the Company's disclosure controls and procedures;

(h)　　the Form 10-K did not fully comply with the requirements of Section 13(a) or 15(d) of the Exchange Act;

(i)　　INTL FCStone's financial statements were not prepared in accordance with GAAP or the Company's own stated accounting policies, as detailed in ¶¶110-118; and

(j)　　INTL FCStone's internal controls were materially deficient, as detailed in ¶109.

**Defendants' Contemporaneous Reckless Disregard of the Falsity of Statement 9**

89.　　The following facts, viewed holistically, establish Defendants' scienter with respect to the false statements contained in ¶¶86-87:

(a)　　**Defendants Ignored Critical Red Flags that Put Them on Notice that the Company Was Vulnerable to False Financial Statements and Control Deficiencies**

(i)　　Defendants knew they had overwhelmed the Hanley business to the point that the Hanley personnel could not handle the roll-out of its capabilities to the Company's 8,000 commercial customers;

(ii)　　Defendants knew the Company had just completed the transformational FCStone merger;

(iii)　　Defendants knew the Company completed six additional key acquisitions in the span of just twelve months;

(iv)　　Defendants knew the Company had just nearly doubled its customer count;

(v)　　Defendants knew that the Company just engaged in a geographic expansion to South America, Europe and Asia;

- 46 -

(vi)     Defendants knew that the Company's employee headcount had increased by 59%; and

(vii)     Defendants knew that they expedited the growth of the Company far in excess of what they had originally planned.

(b)     **The Individual Defendants Failed to Check Information They Had a Duty to Monitor**

(i)     The Individual Defendants had a statutory duty to monitor the Company's internal controls pursuant to SOX, and their failure to check information they had a duty to monitor constitutes recklessness;

(ii)     The Individual Defendants falsely certified the Company's internal controls pursuant to SOX;

(iii)     The Individual Defendants admittedly: (1) were personally responsible for establishing and maintaining INTL FCStone's internal controls over financial reporting; and (2) personally designed such internal controls over financial reporting, or caused such controls over financial reporting to be designed under their supervision; and

(iv)     After the Class Period, INTL FCStone admitted in the restatement that the Defendants "did not design or maintain effective internal controls as of December 31, 2012 related to accounting for income taxes and the valuation of interest rate swaps."

(c)     **Core Operations Doctrine**

(i)     During the Class Period, there was nothing more central to INTL FCStone's core operations than the Commodity and Risk Management division, into which Hanley was integrated after its acquisition;

(ii)     Prior to the Hanley acquisition in July 2010, the revenues from Commodity and Risk Management accounted for 40% of the Company's net revenues. After the Hanley acquisition, Commodity and Risk Management's contribution to the Company's net revenues increased significantly, *see* ¶121;

(iii)     Because the Hanley segment and its operations were indisputably a significant part of INTL FCStone, knowledge of the problems with Hanley's accounting are properly imputed to Defendants; and

(iv)     Where the accounting irregularities relate to accounting practices that are sufficiently critical to the core operations of the company, knowledge of the accounting improprieties are properly imputed to the company's officers and directors who are involved in the day-to-day operations of the company.

(d)     **GAAP Violations**

(i)     The restatement confirms that the Company committed significant violations of GAAP.  *See* ¶¶110-118; and

(ii)     When significant GAAP violations are described with particularity, they provide powerful indirect evidence of scienter.

**Statement 10: 1Q13 Earnings Release and Form 10-Q**

90.     On February 6, 2013, after the market closed, the Company issued a press release, announcing its financial results for the first quarter of fiscal year 2013 ended December 31, 2012.  For the quarter, the Company reported net income of $13.3 million, or $0.68 diluted EPS and total operating revenues of $125.7 million, compared to a net loss of $400,000, or ($0.02) diluted EPS and total operating revenues of $96.3 million for the same period a year ago.  The following day, the Company filed a quarterly report for the period ended December 31, 2012 on a Form 10-Q with the SEC, signed by Defendants O'Connor and Dunaway, which reiterated the Company's previously reported financial results and financial position.  The Company stated that its financial statements were prepared in accordance with GAAP.

91.     In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway, stating that the financial information contained in the Form 10-Q was accurate, the Company's internal controls were effective, and disclosed any material changes to the Company's internal control over financial reporting.

**Falsity of Statement 10**

92.     The statements in ¶¶90-91 were materially false and misleading at the time they were made because, as Defendants themselves admitted in the restatement:

(a)     INTL FCStone overstated revenues in trading gains of up to $10.2 million, causing a cumulative overstatement of net income of $5.9 million during the Class Period, and misstated certain principal over-the-counter derivative trading activities during fiscal year 2013;

(b)     INTL FCStone's financial statements, and other financial information included in the Form 10-Q, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-Q;

(c)     INTL FCStone's financial statements, and other financial information included in the Form 10-Q, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-Q;

(d)     the Individual Defendants failed to adequately design disclosure controls and procedures, or failed to cause such disclosure controls and procedures to be designed under their supervision, to ensure that material information regarding the Company was made known to them by others within the Company;

(e)     the Individual Defendants failed to adequately design internal controls over financial reporting, or failed to cause such internal controls over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP;

(f)     the Individual Defendants failed to adequately evaluate the effectiveness of the Company's disclosure controls and procedures;

(g)     the Individual Defendants falsely presented in the Form 10-Q their conclusions about the effectiveness of the Company's disclosure controls and procedures;

(h)     the Form 10-Q did not fully comply with the requirements of Section 13(a) or 15(d) of the Exchange Act;

(i)     INTL FCStone's financial statements were not prepared in accordance with GAAP or the Company's own stated accounting policies, as detailed in ¶¶110-118; and

(j)     INTL FCStone's internal controls were materially deficient, as detailed in ¶109.

### Defendants' Contemporaneous Reckless Disregard of the Falsity of Statement 10

93.     The following facts, viewed holistically, establish Defendants' scienter with respect to the false statements contained in ¶¶90-91:

(a)     **Defendants Ignored Critical Red Flags that Put
Them on Notice that the Company Was Vulnerable
to False Financial Statements and Control Deficiencies**

(i)     Defendants knew they had overwhelmed the Hanley business to the point that the Hanley personnel could not handle the roll-out of its capabilities to the Company's 8,000 commercial customers;

(ii)     Defendants knew the Company had just completed the transformational FCStone merger;

(iii)     Defendants knew the Company completed six additional key acquisitions in the span of just twelve months;

(iv)     Defendants knew the Company had just nearly doubled its customer count;

(v)     Defendants knew that the Company just engaged in a geographic expansion to South America, Europe and Asia;

(vi)     Defendants knew that the Company's employee headcount had increased by 59%; and

(vii)     Defendants knew that they expedited the growth of the Company far in excess of what they had originally planned.

(b)     **The Individual Defendants Failed to
Check Information They Had a Duty to Monitor**

(i)     The Individual Defendants had a statutory duty to monitor the Company's internal controls pursuant to SOX, and their failure to check information they had a duty to monitor constitutes recklessness;

(ii)     The Individual Defendants falsely certified the Company's internal controls pursuant to SOX;

(iii)     The Individual Defendants admittedly: (1) were personally responsible for establishing and maintaining INTL FCStone's internal controls over financial reporting; and (2) personally designed such internal controls over financial reporting, or caused such controls over financial reporting to be designed under their supervision; and

(iv)     After the Class Period, INTL FCStone admitted in the restatement that the Defendants "did not design or maintain effective internal controls as of December 31, 2012 related to accounting for income taxes and the valuation of interest rate swaps."

- 50 -

(c)      **Core Operations Doctrine**

(i)      During the Class Period, there was nothing more central to INTL FCStone's core operations than the Commodity and Risk Management division, into which Hanley was integrated after its acquisition;

(ii)      Prior to the Hanley acquisition in July 2010, the revenues from Commodity and Risk Management accounted for 40% of the Company's net revenues. After the Hanley acquisition, Commodity and Risk Management's contribution to the Company's net revenues increased significantly, *see* ¶121;

(iii)      Because the Hanley segment and its operations were indisputably a significant part of INTL FCStone, knowledge of the problems with Hanley's accounting are properly imputed to Defendants; and

(iv)      Where the accounting irregularities relate to accounting practices that are sufficiently critical to the core operations of the company, knowledge of the accounting improprieties are properly imputed to the company's officers and directors who are involved in the day-to-day operations of the company.

(d)      **GAAP Violations**

(i)      The restatement confirms that the Company committed significant violations of GAAP. *See* ¶¶110-118; and

(ii)      When significant GAAP violations are described with particularity, they provide powerful indirect evidence of scienter.

**Statement 11: 2Q13 Earnings Release and Form 10-Q**

94.      On May 8, 2013, the Company issued a press release announcing its financial results for the second quarter of fiscal year 2013 ended March 31, 2013. For the quarter, the Company reported net income of $1.5 million, or $0.08 diluted EPS and total operating revenues of $117.3 million, compared to net income of $2.4 million, or $0.12 diluted EPS and total operating revenues of $119.6 million for the same period a year ago. The same day, the Company filed a quarterly report for the period ended March 31, 2013 on a Form 10-Q with the SEC signed by Defendants O'Connor and Dunaway, which reiterated the Company's previously reported financial results and financial position. The Company stated that its financial statements were prepared in accordance with GAAP.

95.     In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway, stating that the financial information contained in the Form 10-Q was accurate, the Company's internal controls were effective, and disclosed any material changes to the Company's internal control over financial reporting.

**Falsity of Statement 11**

96.     The statements in ¶¶94-95 were materially false and misleading at the time they were made because, as Defendants themselves admitted in the restatement:

(a)     INTL FCStone overstated revenues in trading gains of up to $10.2 million, causing a cumulative overstatement of net income of $5.9 million during the Class Period, and misstated certain principal over-the-counter derivative trading activities during fiscal year 2013;

(b)     INTL FCStone's financial statements, and other financial information included in the Form 10-Q, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-Q;

(c)     INTL FCStone's financial statements, and other financial information included in the Form 10-Q, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-Q;

(d)     the Individual Defendants failed to adequately design disclosure controls and procedures, or failed to cause such disclosure controls and procedures to be designed under their supervision, to ensure that material information regarding the Company was made known to them by others within the Company;

(e)     the Individual Defendants failed to adequately design internal controls over financial reporting, or failed to cause such internal controls over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP;

(f)     the Individual Defendants failed to adequately evaluate the effectiveness of the Company's disclosure controls and procedures;

(g)     the Individual Defendants falsely presented in the Form 10-Q their conclusions about the effectiveness of the Company's disclosure controls and procedures;

(h)     the Form 10-Q did not fully comply with the requirements of Section 13(a) or 15(d) of the Exchange Act;

(i)      INTL FCStone's financial statements were not prepared in accordance with GAAP or the Company's own stated accounting policies, as detailed in ¶¶110-118; and

(j)      INTL FCStone's internal controls were materially deficient, as detailed in ¶109.

**Defendants' Contemporaneous Reckless Disregard of the Falsity of Statement 11**

97.      The following facts, viewed holistically, establish Defendants' scienter with respect to the false statements contained in ¶¶94-95:

(a)      **Defendants Ignored Critical Red Flags that Put**
         **Them on Notice that the Company Was Vulnerable**
         **to False Financial Statements and Control Deficiencies**

(i)      Defendants knew they had overwhelmed the Hanley business to the point that the Hanley personnel could not handle the roll-out of its capabilities to the Company's 8,000 commercial customers;

(ii)     Defendants knew the Company had just completed the transformational FCStone merger;

(iii)    Defendants knew the Company completed six additional key acquisitions in the span of just twelve months;

(iv)     Defendants knew the Company had just nearly doubled its customer count;

(v)      Defendants knew that the Company just engaged in a geographic expansion to South America, Europe and Asia;

(vi)     Defendants knew that the Company's employee headcount had increased by 59%; and

(vii)    Defendants knew that they expedited the growth of the Company far in excess of what they had originally planned.

(b)      **The Individual Defendants Failed to**
         **Check Information They Had a Duty to Monitor**

(i)      The Individual Defendants had a statutory duty to monitor the Company's internal controls pursuant to SOX, and their failure to check information they had a duty to monitor constitutes recklessness;

(ii)     The Individual Defendants falsely certified the Company's internal controls pursuant to SOX;

- 53 -

(iii)    The Individual Defendants admittedly: (1) were personally responsible for establishing and maintaining INTL FCStone's internal controls over financial reporting; and (2) personally designed such internal controls over financial reporting, or caused such controls over financial reporting to be designed under their supervision; and

(iv)    After the Class Period, INTL FCStone admitted in the restatement that the Defendants "did not design or maintain effective internal controls as of December 31, 2012 related to accounting for income taxes and the valuation of interest rate swaps."

(c)    **Core Operations Doctrine**

(i)    During the Class Period, there was nothing more central to INTL FCStone's core operations than the Commodity and Risk Management division, into which Hanley was integrated after its acquisition;

(ii)    Prior to the Hanley acquisition in July 2010, the revenues from Commodity and Risk Management accounted for 40% of the Company's net revenues.  After the Hanley acquisition, Commodity and Risk Management's contribution to the Company's net revenues increased significantly, *see* ¶121;

(iii)    Because the Hanley segment and its operations were indisputably a significant part of INTL FCStone, knowledge of the problems with Hanley's accounting are properly imputed to Defendants; and

(iv)    Where the accounting irregularities relate to accounting practices that are sufficiently critical to the core operations of the company, knowledge of the accounting improprieties are properly imputed to the company's officers and directors who are involved in the day-to-day operations of the company.

(d)    **GAAP Violations**

(i)    The restatement confirms that the Company committed significant violations of GAAP.  *See* ¶¶110-118; and

(ii)    When significant GAAP violations are described with particularity, they provide powerful indirect evidence of scienter.

**Statement 12: 3Q13 Earnings Release and Form 10-Q**

98.    On August 7, 2013, the Company issued a press release announcing its financial results for the third quarter of fiscal year 2013 ended June 30, 2013.  For the quarter, the Company reported net income of $2.8 million, or $0.15 diluted EPS and total operating revenues of $122.1 million, compared to net income of $4.7 million, or $0.23 diluted EPS and total operating revenues of $123.8 million for the same period a year ago.  The same day, the

Company filed a quarterly report for the period ended June 30, 2013 on a Form 10-Q with the SEC signed by Defendants O'Connor and Dunaway, which reiterated the Company's previously reported financial results and financial position.   The Company stated that its financial statements were prepared in accordance with GAAP.

99.    In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants O'Connor and Dunaway, stating that the financial information contained in the Form 10-Q was accurate, and disclosed any material changes to the Company's internal control over financial reporting.

**Falsity of Statement 12**

100.    The statements in ¶¶98-99 were materially false and misleading at the time they were made because, as Defendants themselves admitted in the restatement:

(a)    INTL FCStone overstated revenues in trading gains of up to $10.2 million, causing a cumulative overstatement of net income of $5.9 million during the Class Period, and misstated certain principal over-the-counter derivative trading activities during fiscal year 2013;

(b)    INTL FCStone's financial statements, and other financial information included in the Form 10-Q, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-Q;

(c)    INTL FCStone's financial statements, and other financial information included in the Form 10-Q, did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in the Form 10-Q;

(d)    the Individual Defendants failed to adequately design disclosure controls and procedures, or failed to cause such disclosure controls and procedures to be designed under their supervision, to ensure that material information regarding the Company was made known to them by others within the Company;

(e)    the Individual Defendants failed to adequately design internal controls over financial reporting, or failed to cause such internal controls over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP;

(f)     the Individual Defendants failed to adequately evaluate the effectiveness of the Company's disclosure controls and procedures;

(g)     the Individual Defendants falsely presented in the Form 10-Q their conclusions about the effectiveness of the Company's disclosure controls and procedures;

(h)     the Form 10-Q did not fully comply with the requirements of Section 13(a) or 15(d) of the Exchange Act;

(i)     INTL FCStone's financial statements were not prepared in accordance with GAAP or the Company's own stated accounting policies, as detailed in ¶¶110-118; and

(j)     INTL FCStone's internal controls were materially deficient, as detailed in ¶109.

**Defendants' Contemporaneous Reckless Disregard of the Falsity of Statement 12**

101.     The following facts, viewed holistically, establish Defendants' scienter with respect to the false statements contained in ¶¶98-99:

(a)     **Defendants Ignored Critical Red Flags that Put Them on Notice that the Company Was Vulnerable to False Financial Statements and Control Deficiencies**

(i)     Defendants knew they had overwhelmed the Hanley business to the point that the Hanley personnel could not handle the roll-out of its capabilities to the Company's 8,000 commercial customers;

(ii)     Defendants knew the Company had just completed the transformational FCStone merger;

(iii)     Defendants knew the Company completed six additional key acquisitions in the span of just twelve months;

(iv)     Defendants knew the Company had just nearly doubled its customer count;

(v)     Defendants knew that the Company just engaged in a geographic expansion to South America, Europe and Asia;

(vi)     Defendants knew that the Company's employee headcount had increased by 59%; and

(vii)     Defendants knew that they expedited the growth of the Company far in excess of what they had originally planned.

- 56 -

     (b)      **The Individual Defendants Failed to
Check Information They Had a Duty to Monitor**

         (i)        The Individual Defendants had a statutory duty to monitor the Company's internal controls pursuant to SOX, and their failure to check information they had a duty to monitor constitutes recklessness;

         (ii)        The Individual Defendants falsely certified the Company's internal controls pursuant to SOX;

         (iii)       The Individual Defendants admittedly: (1) were personally responsible for establishing and maintaining INTL FCStone's internal controls over financial reporting; and (2) personally designed such internal controls over financial reporting, or caused such controls over financial reporting to be designed under their supervision; and

         (iv)       After the Class Period, INTL FCStone admitted in the restatement that the Defendants "did not design or maintain effective internal controls as of December 31, 2012 related to accounting for income taxes and the valuation of interest rate swaps."

     (c)      **Core Operations Doctrine**

         (i)        During the Class Period, there was nothing more central to INTL FCStone's core operations than the Commodity and Risk Management division, into which Hanley was integrated after its acquisition;

         (ii)        Prior to the Hanley acquisition in July 2010, the revenues from Commodity and Risk Management accounted for 40% of the Company's net revenues. After the Hanley acquisition, Commodity and Risk Management's contribution to the Company's net revenues increased significantly, *see* ¶121;

         (iii)       Because the Hanley segment and its operations were indisputably a significant part of INTL FCStone, knowledge of the problems with Hanley's accounting are properly imputed to Defendants; and

         (iv)       Where the accounting irregularities relate to accounting practices that are sufficiently critical to the core operations of the company, knowledge of the accounting improprieties are properly imputed to the company's officers and directors who are involved in the day-to-day operations of the company.

     (d)      **GAAP Violations**

         (i)        The restatement confirms that the Company committed significant violations of GAAP. *See* ¶¶110-118; and

         (ii)        When significant GAAP violations are described with particularity, they provide powerful indirect evidence of scienter.

**The December 17, 2013 Partial Disclosure**

102.   On December 17, 2013, the Company issued a press release announcing its filing, on this date, of a Form 12b-25 with the SEC, "stating that the Company was not able to file its Form 10-K for the fiscal year ended September 30, 2013 on the due date . . ."  The Company provided the following explanation:

> In connection with the preparation of its consolidated financial statements for the fiscal year ended September 30, 2013, INTL FCStone *identified errors in the reconciliation of the Company's subsidiary INTL FCStone Markets, LLC's accounting records to its back office system*, which has resulted in a delay in finalizing the Company's consolidated financial statements required to be included in the Company's Form 10-K.  As a result, the Company is evaluating the effect these errors may have on previously filed consolidated financial statements covering the Company's interim periods for the fiscal year ended September 30, 2013 as well as the previously filed audited and interim consolidated financial statements for the Company's fiscal years ended September 30, 2012 and 2011.
>
> *The Company believes these errors may reflect an overstatement of revenues in trading gains, net in prior fiscal periods of up to $10.2 million and correspondingly an overstatement of net income of up to approximately $6.4 million*.  The errors do not relate to any customer-owned collateral.  The Company has not yet determined whether the errors will have a material impact on the Company's previously reported consolidated financial information, and therefore the Audit Committee cannot yet conclude that such consolidated financial statements and the information derived therefrom should no longer be relied upon.  If, upon further review, the Audit Committee determines that any previously issued consolidated financial statement should no longer be relied upon because of the errors, the Company will file a Current Report on Form 8-K disclosing the Audit Committee's determination.

103.   On this news, INTL FCStone securities declined $1.62 per share or nearly 8%, to close at $18.93 per share on December 17, 2013.

**The January 9, 2014 Partial Disclosure**

104.   On January 9, 2014, the Company issued a press release explaining that it would be restating its previously filed financial statements for the years ended September 30, 2012 and 2011.  The Company stated, in pertinent part, as follows:

In connection with the preparation of its consolidated financial statements for the fiscal year ended September 30, 2013, *the Company identified errors in the reconciliation of the Company's subsidiary INTL FCStone Markets, LLC's accounting records to its back office system which occurred in 2012, 2011 and 2010. These corrections resulted in a reduction in net income of $5.9 million for the years ended September 30, 2012, 2011 and 2010 in aggregate, from $57.7 million as reported to $51.8 million*, which is in line with our announcement dated December 17, 2013.  As a result, the Audit Committee of the Board of Directors in conjunction with management has determined that it is necessary to restate the previously filed consolidated financial statements for the fiscal years ended September 30, 2012 and 2011 and the unaudited consolidated financial statements included in interim reports filed for such periods.

105.    The same day, the Company held a conference call with analysts and investors to discuss the restatement.  Defendant O'Connor provided details of the restatement, stating, in pertinent part, as follows:

During our year-end close procedures, we came to realize that we had an accounting error of approximately $10.2 million.  Upon further review, we had determined that we had overstated revenues by an aggregate $9.5 million relating to the prior three fiscal years.  This was all related to our swap dealer subsidiary.

In order to determine how to proceed with the correction, we have to identify the specific errors, re-perform a vast amount of accounting reconciliations and assess the materiality of this error on each of the prior 12 quarters.  This could not be done in time with the thoroughness and accuracy required so we were forced to delay our filing.

This is not something we do lightly.  And even though the aggregate correction may be deemed small relative to our net worth and even to our earnings in the aggregate over the time period in question, we believe we owe it to our investors and customers to be completely transparent and get our numbers right.

We have now finalized the work and have summarized the necessary corrections in our earnings release which went up right to the market opening this morning.  Early next week, we will be filing our 2013 10-K in which we will restate the previously filed results for the fiscal year 2012 and 2010.

*These errors occurred in one subsidiary and related to the July 2010 acquisition and the subsequent integration of the Hanley swaps business.  During the same period, we more than doubled our transactional volumes on this business and saw a dramatic ramp-up of revenues which exacerbated the situation*.

For a period of time, we are running two separate trading and back-office platforms, Hanley's and ours, each of which use slightly different valuation

- 59 -

methodologies and has to be manually reconciled.   In addition, we have previously been a customer of Hanley's and these positions have to be reconciled with the positions in our books and integrated.

In addition, we then have to move some of the traders in the trading books from the acquired Hanley legal entity into our legal entity, again a manual process. *The errors that occurred during the integration process were masked by a deficient reconciliation process that has also now been corrected*.   The integration itself was completed nearly two years ago and the system deficiency is corrected and the procedures around those have been running smoothly for some time now.

Turning to the next page, we set out the impact of these corrections by year and cumulatively over the period.   In summary, the cumulative effect was less than 2% of our consolidated shareholder fund and around *9% of the aggregate earnings over the period*, both GAAP and in adjusted form.   *While these may not seem to be material in the aggregate over the period, they were considered material in certain individual prior periods*.

106.   In the slide presentation accompanying the earnings call, the Company explained the annual impact of the restatement on the Company's GAAP net income:

| Restated GAAP Net Income | 2012 | 2011 | 2010 |
|---|---|---|---|
| Annual Impact | -15% | -7% | -10% |

107.   Defendant O'Connor discussed the impact on the Company of the accounting issues surrounding the restatement, stating, in pertinent part, as follows:

**Russell C. Mollen** – Bares Capital – Analyst

My first question is the impact from the accounting issues.   *Was there any – post release that you guys had last month, any issues with loss of business or customers leaving or anything like that, being scared away from that uncertainty*?

**Sean Michael O'Connor** – INTL FCStone, Inc. – CEO

Yeah.   And, again, we're going to be very candid and forthright with you here. We worked pretty hard to make sure that when we made our initial announcement that we quantified the extent of the problem because I think, oftentimes, people go out and just say, we don't know what our numbers are.   It's a mess.   And that's

obviously very damaging.  And clearly, our accountants and our advisers had to be onboard with that.

*So we went out and gave a number, and we thought the number, from a counterparty creditworthiness point of view, was largely immaterial.  And honestly, we got a much worse reaction than we anticipated, both in terms of the stock price, which you've probably seen that.  And we did have a number of particularly sort of our larger banks and our larger customers.  They did come on and start asking lots of questions*.

*A couple of our big customers said, we're going to scale back our business and so you guys can verify for us that these numbers are indeed what we think they are*.  And we've now done that.  So, very hard for me to – and you don't know what's happening with people that aren't talking to you, so we don't know.

### The Restatement

108.   On January 15, 2014, the Company filed an annual report for the year ended September 30, 2013 on a Form 10-K with the SEC signed by, among others, Defendants O'Connor and Dunaway, which reiterated the Company's restated financial results.   The Company reported:

### Restatement of Previously Issued Financial Statements

As discussed further in Notes 2 and 21 of the "Notes to Consolidated Financial Statements" contained in Item 8 of this Form 10-K, we are restating consolidated financial statements and other information for the fiscal years ended September 30, 2012 and 2011, certain financial information for the year ended September 30, 2010, and for each of the quarters in the fiscal year ended September 30, 2012. *Management identified a material weakness in internal control over financial reporting that existed as of September 30, 2013, related to the accurate and timely accounting for certain principal over-the-counter derivative trading activities.  Specifically, controls over the reconciliation between trading system data and the general ledger were not designed and operating effectively to timely detect errors in recording trading gains to the general ledger.  As a result of this material weakness, we misstated certain principal over-the-counter derivative trading activities during the reporting periods of October 1, 2010 through September 30, 2013.   Our corrections related to these errors in aggregate resulted in a reduction in net income of $5.9 million collectively for the years ended September 30, 2012, 2011, and 2010*.  The correction of these errors had no impact on the net cash flows related to operating activities, investing activities, or financing activities in our previously reported consolidated statements of cash flows for the fiscal years ended September 30, 2012 and 2011.

*        *        *

**Note 2 – Restatement of Previously Issued Financial Statements**

The Company has restated the consolidated financial statements and other financial information for the fiscal years ended September 30, 2012 and 2011, certain financial information for the fiscal year ended September 30, 2010, and for each of the quarters in the fiscal year ended September 30, 2012. *In connection with the preparation of the consolidated financial statements for the fiscal year ended September 30, 2013, the Company identified errors in the reconciliation of the Company's subsidiary INTL FCStone Markets, LLC's accounting records to its back office system which occurred in 2012, 2011 and 2010. Corrections made by the Company related to these errors in aggregate resulted in a reduction in net income of $5.9 million collectively for the years ended September 30, 2012, 2011 and 2010.* The correction of these errors had no impact on the net cash flows related to operating activities, investing activities, or financing activities in the Company's previously reported consolidated statements of cash flows for the fiscal years ended September 30, 2012 and 2011.

109.   The Company reported on the material weaknesses in its internal control over financial reporting:

**Item 9A.   Controls and Procedures**

*(a)        Evaluation of Disclosure Controls and Procedures*

In connection with the filing of this Form 10-K, our management, including the principal executive officer and principal financial officer, evaluated the effectiveness of the design and operation of our disclosure controls and procedures (as such term is defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of September 30, 2013. We seek to design our disclosure controls and procedures to provide reasonable assurance that the reports we file or submit under the Exchange Act contain the required information and that we submit these reports within the time periods specified in SEC rules and forms. We also seek to design these controls and procedures to ensure that we accumulate and communicate correct information to our management, including our principal executive and principal financial officers, as appropriate, to allow timely decisions regarding required disclosure.

Based on our evaluation, we identified a material weakness in our internal control over financial reporting related to the accounting for certain principal over-the-counter derivative trading activities. *Because of the material weakness described below, our principal executive officer and principal financial officer concluded that we did not maintain effective internal control over financial reporting as of September 30, 2013.*

*(b)*     ***Management's Report on Internal Control Over Financial Reporting***

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f).  Our internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles ("GAAP").  Our internal control over financial reporting includes those policies and procedures that: (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the Company's assets that could have a material effect on the financial statements.

There are limitations inherent in any internal control, such as the possibility of human error and the circumvention or overriding of controls.  A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met, and may not prevent or detect misstatements.  As conditions change over time, so too may the effectiveness of internal controls.  A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

Management (with the participation of our principal executive officer and principal financial officer) evaluated the Company's internal control over financial reporting as of September 30, 2013, based on the framework in *Internal Control - Integrated Framework (1992)* issued by the Committee of Sponsoring Organizations (COSO) of the Treadway Commission.  Based on the evaluation and the criteria set forth in the COSO report, we identified a material weakness in internal control over financial reporting as described below.

***Management identified a material weakness in internal control over financial reporting that existed as of September 30, 2013, related to the accurate and timely accounting for certain principal over-the-counter derivative trading activities.  Specifically, controls over the reconciliation between trading system data and the general ledger and the review thereof were not designed to detect errors timely in recording trading gains to the general ledger.  As a result of this material weakness, the Company misstated certain principal over-the-counter derivative trading activities.  We corrected these misstatements and restated our consolidated financial statements for the years ended September 30, 2012 and 2011 and adjusted the preliminary consolidated financial***

*statements for the year ended September 30, 2013 in connection with the issuance of the September 30, 2013 consolidated financial statements.*

*Because of the material weakness described above, management concluded that the Company did not maintain effective internal control over financial reporting as of September 30, 2013.*

KPMG LLP, an independent registered public accounting firm, audited the effectiveness of our internal control over financial reporting as of September 30, 2013, and KPMG LLP issued a report on the effectiveness of the Company's internal control over financial reporting as of September 30, 2013, which is included in Item 8 "Consolidated Financial Statements and Supplementary Data" of this Annual Report on Form 10-K and expresses an adverse opinion on the effectiveness of our internal control over financial reporting.

### INTL FCStone's Financial Statements Violated GAAP

110.   Compliance with GAAP is a basic fundamental obligation of publicly traded companies.  As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate."  17 C.F.R. §210.4-01(a)(1).

111.   During the Class Period, Defendants represented that INTL FCStone's financial statements were presented in conformity with GAAP and that the Company maintained a sound system of internal controls over its financial reporting.

112.   Defendants have now admitted that such representations were false and that INTL FCStone's previously issued financial statements for the years ended and as of September 30, 2012 and September 30, 2011, "should no longer be relied upon."

113.   In addition, Defendants have also acknowledged that their Class Period representations about the soundness of the Company's system of internal controls over its financial reporting were also materially false and misleading.

114.   Defendants have admitted that during the years ended September 30, 2012, September 30, 2011 and September 30, 2010, the Company falsely inflated its net trading gains

and concomitant counterparty receivables by a combined $9.5 million.  The overstatement in the Company's reported trading gains resulted in a dollar for dollar inflation in its profitability, which, as illustrated in the following chart, caused a material overstatement of INTL FCStone's pre-tax income during the Class Period:

| Year | (in millions) Pre-Tax Income Originally Reported | Pre-Tax Income As Restated | Overstatement | % Overstated |
|------|------|------|------|------|
| 2012 | $19.3 | $15.8 | $3.5 | 22.15% |
| 2011 | $59.5 | $55.4 | $4.1 | 7.40% |
| 2010 | $17.9 | $16.0 | $1.9 | 11.88% |

115.    Generally, GAAP provides that the conditions for revenue recognition ordinarily are met when persuasive evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable, and collectability is reasonably assured.  *See, e.g.*, Financial Accounting Standards Board, Accounting Standards Codification Topic 605.

116.    INTL FCStone's financial statements for the years ended September 30, 2012, September 30, 2011, and September 30, 2010 disclosed, in all material respects, the Company's policy of accounting for trading gains, in pertinent part, as follows:

> Trading gains, net include brokerage fees and margins generated from OTC derivative trades executed with customers and other counterparties and are recognized when trades are executed.  Trading gains, net also include activities where the Company acts as principal in the purchase and sale of individual securities, currencies, commodities or derivative instruments with customers.  These transactions may be offset simultaneously with another customer or counterparty, offset with similar but not identical positions on an exchange, made from inventory, or may be aggregated with other purchases to provide liquidity intraday, for a number of days, or in some cases, particularly the base metals business, even longer periods (during which fair value may fluctuate).  In addition, trading gains, net includes activities from the Company's operations of a proprietary foreign exchange desk which arbitrages the futures and cash markets (see additional discussion in the Financial Instruments and Derivatives policy note for revenue recognition on proprietary trading activities).  Net dealer inventory

- 65 -

and investment gains are recognized on a trade-date basis and include realized gains or losses and changes in unrealized gains or losses on investments at fair value.  Dividend income and dividend expense, on short equity positions, are recognized net, within 'trading gain, net' on the ex-dividend date.

117.   Defendants have now admitted that, during the Class Period, INTL FCStone violated its publicly disclosed accounting policy for trading gains, and GAAP, when it improperly accounted for certain principal over-the-counter derivative trading activities.

118.   In doing so, Defendants breached their duties to investors, put the Company's assets at risk and violated the provisions of Exchange Act Section 13(b)(2)(B), which requires, in part, that every issuer subject to Section 12 of the Exchange Act:

> devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
> A.    transactions are executed in accordance with management's general or specific authorization;
>
> B.    transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;
>
> C.    access to assets is permitted only in accordance with management's general or specific authorization.

## ADDITIONAL SCIENTER ALLEGATIONS

119.   Defendants ignored the following red flags, which indicated that the Company was vulnerable to false financial statements and control deficiencies, and experiencing trouble integrating the Hanley business: (1) the Hanley business was overwhelmed to the point that the Hanley personnel could not handle the roll-out of its capabilities to the Company's 8,000 commercial customers; (2) the transformational FCStone merger had just been completed; (3) six additional key acquisitions were completed in the span of just twelve months; (4) the Company's customer count nearly doubled; (5) the Company engaged in a geographic expansion to South

America, Europe and Asia; (6) the Company's employee headcount increased by 59%; and (7) the Company's growth was expedited far in excess of what they had originally planned.

120.    The Individual Defendants recklessly disregarded the false and misleading nature of the SOX certifications they signed.  Throughout the Class Period, Defendants O'Connor and Dunaway signed sworn certifications, pursuant to their statutory duty under SOX, stating that the Company's internal controls over financial reporting, which they personally designed, or caused to be designed under their supervision, were effective and contained no material weaknesses. They repeatedly, and recklessly, falsely certified the effectiveness of the Company's internal controls despite the aforementioned red flags.

121.    Defendants recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public because the operating segment whose financials required restating, Commodity and Risk Management, constituted the core operations of the Company.  Commodity and Risk Management is the Company's largest reporting segment; during the Class Period, that segment reported net revenues representing as much as 64% of the Company's total net revenues.  Commodity and Risk Management's share of total net revenues averaged well over half of the Company's total net revenue throughout the Class Period, specifically representing 49% of net revenues in 4Q10; 57% in 1Q11; 62% in 2Q11; 64% in 3Q11; 61% in 4Q11; 53.6% in 1Q12; 56% in 2Q12; 55% in 3Q12; 55% in 4Q12; 50% in 1Q13; 49% in 2Q13; and 48% in 3Q13.  Because the Hanley segment and its operations were indisputably a significant part of INTL FCStone, knowledge of the problems with Hanley's accounting are properly imputed to Defendants.

122.    In addition, Defendants were motivated to inflate the Company's net income and EPS in order to beat analysts' earnings estimates.  For example, an analyst from Singular

Research estimated adjusted EPS for full-year 2011 of $1.95. The Company reported EPS for 2011 of $2.07. However, the restatement caused EPS for 2011 to fall to $1.93, below the Singular Research analyst's estimate.

123.   As alleged herein, Defendants acted with scienter in that they recklessly disregarded that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading. Defendants recklessly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. Defendants – by virtue of their receipt of information reflecting the true facts regarding INTL FCStone, their control over, and/or receipt and/or modification of INTL FCStone's allegedly materially misleading misstatements – were active and culpable participants in the fraudulent scheme alleged herein.

## LOSS CAUSATION/ECONOMIC LOSS

124.   During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of INTL FCStone common stock and operated as a fraud or deceit on Class Period purchasers of INTL FCStone common stock by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of INTL FCStone common stock fell precipitously as the prior artificial inflation came out.

125.   As a result of their purchases of INTL FCStone common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect

and caused INTL FCStone common stock to trade at artificially inflated levels throughout the Class Period, trading at $27.26 per share on February 6, 2012.

126.    By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of INTL FCStone's business and prospects.  When the truth about the Company was revealed to the market, the price of INTL FCStone common stock fell precipitously.  These declines removed the inflation from the price of INTL FCStone common stock, causing real economic loss to investors who had purchased INTL FCStone common stock during the Class Period.

127.    Specifically, on February 9, 2012, INTL FCStone reported revenues $20 million lower than the same period for the prior year.  During a conference call that day with analysts and investors, the Company discussed various critical issues such as slowing revenue streams, falling volume in the commodities market, and overall lack of a clear and compelling business model.  As a result of the all of the acquisitions, revenue per head declined significantly, from $579,674 per employee in the first quarter of 2011 to $387,126 per employee in the first quarter of 2012, because many of the newly acquired business were not performing.  Defendants acknowledged that the favorable market conditions that existed until then masked the poor performance of the Company's businesses.  On this news, the price of INTL FCStone stock fell $3.94 per share, or 14%, to close on February 9, 2012 at $22.54 per share.

128.    On December 17, 2013, the Company disclosed that it would not be able to file its Form 10-K for the fiscal year ended September 30, 2013, due to a review to evaluate the need to restate its financial results for its 2011, 2012 and 2013 fiscal years as a result of an overstatement of trading gains discovered in the reconciliation of FCStone Markets.  The Company said the restatement would reduce previously reported trading gains by up to $10.2 million and

consolidated net income by approximately $6.4 million.   On this news, the price of INTL FCStone stock fell $1.62 per share, or nearly 8%, to close at $18.93 per share on December 17, 2013.

129.    The declines in the price of INTL FCStone common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in INTL FCStone common stock negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of INTL FCStone common stock and the subsequent significant decline in the value of INTL FCStone common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

130.    At all relevant times, the market for INTL FCStone common stock was an efficient market for the following reasons, among others:

(a)    INTL FCStone common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)    as a regulated issuer, INTL FCStone filed periodic public reports with the SEC and the NASDAQ;

(c)    INTL FCStone regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press

releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     INTL FCStone was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

131.    As a result of the foregoing, the market for INTL FCStone common stock promptly digested current information regarding INTL FCStone from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of INTL FCStone common stock during the Class Period suffered similar injury through their purchase of INTL FCStone common stock at artificially inflated prices and a presumption of reliance applies.

132.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding INTL FCStone's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

**NO SAFE HARBOR**

133.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker recklessly disregarded that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of INTL FCStone who recklessly disregarded that those statements were false when made.

**COUNT I**

**(Against All Defendants For Violations of Section 10(b) of the
Exchange Act and Rule 10b-5 Promulgated Thereunder)**

134.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

135.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

136.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state

material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of INTL FCStone securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase INTL FCStone securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

137.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for INTL FCStone securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about INTL FCStone's finances and business prospects.

138.    By virtue of their positions at INTL FCStone, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In

addition, each Defendant recklessly disregarded that material facts were being misrepresented or omitted as described above.

139.   Information showing that Defendants acted with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of INTL FCStone, the Individual Defendants had knowledge of the details of INTL FCStone internal affairs.

140.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of INTL FCStone.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to INTL FCStone's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of INTL FCStone securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning INTL FCStone's business and financial condition which were concealed by Defendants, Lead Plaintiff and the other members of the Class purchased INTL FCStone securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

141.   During the Class Period, INTL FCStone securities were traded on an active and efficient market.  Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased shares of INTL

FCStone securities at prices artificially inflated by Defendants' wrongful conduct.  Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased said securities, or would not have purchased them at the inflated prices that were paid.  At the time of the purchases by Lead Plaintiff and the Class, the true value of INTL FCStone securities was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class.  The market price of INTL FCStone securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and Class members.

142.    By reason of the conduct alleged herein, Defendants recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

143.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act)

144.    Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

145.    During the Class Period, the Individual Defendants participated in the operation and management of INTL FCStone, and conducted and participated, directly and indirectly, in the conduct of INTL FCStone's business affairs.  Because of their senior positions, they knew and/or recklessly disregarded the adverse non-public information about INTL FCStone's misstatement of income and expenses and false financial statements.

- 75 -

146.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to INTL FCStone's financial condition and results of operations, and to correct promptly any public statements issued by INTL FCStone which had become materially false or misleading.

147.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which INTL FCStone disseminated in the marketplace during the Class Period concerning INTL FCStone's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause INTL FCStone to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of INTL FCStone within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of INTL FCStone securities.

148.    Each of the Individual Defendants, therefore, acted as a controlling person of INTL FCStone.  By reason of their senior management positions and/or being directors of INTL FCStone, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, INTL FCStone to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of INTL FCStone and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

149.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by INTL FCStone.

## PRAYER FOR RELIEF

**WHEREFORE,** Lead Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Lead Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Lead Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED:  March 6, 2015                    ROBBINS GELLER RUDMAN
                                           & DOWD LLP
                                         SAMUEL H. RUDMAN
                                         ROBERT M. ROTHMAN
                                         ALAN I. ELLMAN


                                              */s/ Robert M. Rothman*
                                         ROBERT M. ROTHMAN

                                         58 South Service Road, Suite 200
                                         Melville, NY  11747
                                         Telephone:  631/367-7100
                                         631/367-1173 (fax)
                                         srudman@rgrdlaw.com
                                         rrothman@rgrdlw.com
                                         aellman@rgrdlaw.com

                                         *Lead Counsel for Lead Plaintiff*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 6, 2015, I authorized the foregoing Second Amended Complaint for Violations of the Federal Securities Laws to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.


*/s/ Robert M. Rothman*
ROBERT M. ROTHMAN