UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
:
PAUL WOEBEL, Individually and on Behalf of All :
Other Persons Similarly Situated, :  **ORDER GRANTING MOTION TO**
: **DISMISS SECOND AMENDED**
Plaintiff, : **COMPLAINT**
:
-against- : 14 Civ. 232 (AKH)
:
INTL FCSTONE, INC., SEAN M. O'CONNOR, :
and WILLIAM J. DUNAWAY, :
:
Defendants. :
------------------------------------------------------------ X
ALVIN K. HELLERSTEIN, U.S.D.J.:

      On January 13, 2014, a securities fraud lawsuit was filed against INTL FCStone Inc. ("INTL FCStone" or the "company") on behalf of a nationwide class. Following appointment of lead plaintiff and lead plaintiff's counsel, an amended complaint was filed on June 13, 2014 (the "Amended Complaint"). (Dkt. No. 28.) The Amended Complaint alleged violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder by defendants INTL FCStone, the CEO of the company Sean M. O'Connor, and the CFO of the company William J. Dunaway (O'Connor and Dunaway are hereinafter referred to as the "Individual Defendants") (collectively, "Defendants"). (Amended Complaint, Dkt. No. 28 ("AC") at ¶¶ 144-153.) The Amended Complaint also alleged violations of Section 20(a) of the Securities Exchange Act against the Individual Defendants. (*Id.* at ¶¶ 154-159.)

      On July 28, 2014, Defendants moved to dismiss the Amended Complaint on the grounds that it fails to adequately allege multiple key elements of action under Section 10(b) and Rule 10b-5: particularly, falsity and scienter. (Dkt. No. 30 at 1.) The motions became fully briefed on October 14, 2014, and oral argument was heard on February 4, 2015, at which I

1

granted the motion and gave plaintiffs an opportunity to replead. (Dkt. No. 39 at 24:19-25:4.) Plaintiffs filed a second amended complaint (the "Second Amended Complaint" or "SAC") on March 6, 2015 (Dkt. No. 41), and Defendants again moved to dismiss (Dkt. No. 42). Since the SAC fails to adequately plead scienter, Defendants' motion to dismiss is GRANTED and the Second Amended Complaint is DISMISSED in its entirety.

## I.  BACKGROUND

Lead plaintiff, the International Union of Painters & Allied Trades District Council No. 35 Pension Plan and Annuity Fund ("Plaintiff") has brought this action on behalf of itself and those who purchased or acquired INTL FCStone stock during the period from December 15, 2010 and December 16, 2013, inclusive (the "Class Period"). (SAC at ¶ 1.) INTL FCStone is a financial services holding company, which, along with its subsidiaries, offers a broad spectrum of financial services. (*Id.* ¶ 2.) INTL FCStone is the product of a September 2009 merger of International Assets Holding Corporation ("International Assets") and FCStone Group, Inc. ("FCStone") (the "FCStone Merger"). (*Id.* ¶ 38.) The newly-formed INTL FCStone had twice the net asset value, four times the assets, three times the employees, and a much larger global reach and customer base than International Assets. (*Id.* at ¶ 39.)

Following the merger, INTL FCStone purchased six smaller financial services firms in 2010 and early 2011, doubling its customer count from approximately 11,000 to over 20,000, and increasing its total headcount by 59%. (*Id.* ¶ 40-41.) One of the subsidiaries the company acquired was Hanley Capital Group ("Hanley"), which became an entity known as INTL FCStone Markets LLC ("FCStone Markets"). (*Id.* ¶ 6.) FCStone Markets provides commodity trading services and risk management ("Commodity and Risk Management"). The

2

Commodity and Risk Management segment reported net revenues amounting to 64% of the company's total net revenues during the Class Period. (*Id.*)

Defendant O'Connor has served at all relevant times as the company's Chief Executive Officer ("CEO"). (*Id.* ¶ 22.) Defendant Dunaway has served at all relevant times as the company's Chief Financial Officer ("CFO"). (*Id.* ¶ 23.)

The Amended Complaint alleges that the Defendants made the following materially false and misleading statements during the Class Period.

- December 2010: A press release stating the financial results for the fourth quarter and fiscal year ending September 30, 2010; a quarterly report with those financials stating that they were prepared in accordance with GAAP and that the Individual Defendants established and maintained disclosure controls and procedures and internal control over financial reporting. (¶¶ 45-47.)

- February 2011: A press release stating the financial results for the first quarter ending December 31, 2010; a quarterly report with those financials stating that they were prepared in accordance with GAAP and that the Individual Defendants established and maintained disclosure controls and procedures and internal control over financial reporting. (¶¶ 50-51.)

- May 2011: A press release stating the financial results for the second quarter ending March 31, 2011; a quarterly report with those financials stating that they were prepared in accordance with GAAP and that the Individual Defendants established and maintained disclosure controls and procedures and internal control over financial reporting. (¶¶ 54-55.)

- August 2011: A press release stating the financial results for the third quarter ending June 30, 2011; a quarterly report with those financials stating that they were prepared in accordance with GAAP and that the Individual Defendants established and maintained disclosure controls and procedures and internal control over financial reporting. (¶¶ 58-59.) Also a conference call in which defendant O'Connor stated: "In terms of integration, I think it's going really well. Both with Hanley and Provident, the concept was to take those capabilities and roll them out to our 8,000 commercial customers. In both instances we have pretty quickly overwhelmed both of those businesses. They put their hands up early on and said, enough already, let us deal with what we've got on our plates. The problem there a little bit is not so much of integration, but of capacity." (*Id.* at 78.)

- December 2011: A press release stating the financial results for the fourth quarter and fiscal year ending September 30, 2011; a quarterly report with those financials stating that they were prepared in accordance with GAAP and that the Individual Defendants established and maintained disclosure controls and procedures and internal control over financial reporting. (¶¶ 63-64.)

- February 2012: A press release stating the financial results for the first quarter ending December 31, 2011; a quarterly report with those financials stating that they were prepared in accordance with GAAP and that the Individual Defendants established and maintained disclosure controls and procedures and internal control over financial reporting. (¶¶ 74-75.)

- May 2012: A press release stating the financial results for the second quarter ending March 31, 2012; a quarterly report with those financials stating that they were prepared in

accordance with GAAP and that the Individual Defendants established and maintained disclosure controls and procedures and internal control over financial reporting. (¶¶ 78-79.)

- August 2012: A press release stating the financial results for the third quarter ending June 30, 2012; a quarterly report with those financials stating that they were prepared in accordance with GAAP and that the Individual Defendants established and maintained disclosure controls and procedures and internal control over financial reporting. (¶¶ 82-83.)

- December 2012: A press release stating the financial results for the fourth quarter and fiscal year ending September 30, 2012; a quarterly report with those financials stating that they were prepared in accordance with GAAP and that the Individual Defendants established and maintained disclosure controls and procedures and internal control over financial reporting. (¶¶ 86-87.)

- February 2013: A press release stating the financial results for the first quarter ending December 31, 2012; a quarterly report with those financials stating that they were prepared in accordance with GAAP and that the Individual Defendants established and maintained disclosure controls and procedures and internal control over financial reporting. (¶¶ 90-91.)

- May 2013: A press release stating the financial results for the second quarter ending March 31, 2013; a quarterly report with those financials stating that they were prepared in accordance with GAAP and that the Individual Defendants established and maintained disclosure controls and procedures and internal control over financial reporting. (¶¶ 94-95.)

- August 2013: A press release stating the financial results for the third quarter ending June 30, 2013; a quarterly report with those financials stating that they were prepared in accordance with GAAP and that the Individual Defendants established and maintained disclosure controls and procedures and internal control over financial reporting. (¶¶ 98-99.)

These statements are all financial filings and their associated press releases, along with one statement made by defendant O'Connor on the integration of the new subsidiaries into the company.

Plaintiff alleges that on a conference call that took place on February 9, 2012, with analysts and investors to discuss INTL FCStone's first quarter 2012 performance, executives at INTL FCStone "discussed various critical issues such as slowing revenue streams, falling volume in the commodities market, and overall lack of a clear and compelling business model", which "arose principally as a result of [INTL FCStone's] rapid acquisition strategy, and until that point had been masked by favorable market conditions". (*Id.* at ¶¶67-69.) Plaintiff alleges that as a result of the conference call, the price of INTL FCStone fell $3.94 per share, or 14%, to close at $22.54 per share that day. (*Id.* at 71.) Plaintiff alleges that this conference call was a "partial disclosure" of the alleged fraud. (*Id.* at ¶¶ 67-73.)

Plaintiff alleges that thereafter, on December 17, 2013, the company issued a press release stating that it was not able to file its annual report for the fiscal year ending on September 30, 2013, on the due date. (*Id.* at ¶ 102.) The press release stated: "In connection with the preparation of its consolidated financial statements for the fiscal year ended September 30, 2013, INTL FCStone identified errors in the reconciliation of the Company's subsidiary INTL FCStone Markets, LLC's accounting records to its back office system. ... The Company

6

believes these errors may reflect an overstatement of revenues in trading gains, net in prior fiscal periods of up to $10.2 million and correspondingly an overstatement of net income of up to approximately $6.4 million." (*Id.*) On that date, the share price of INTL FCStone securities declined $1.62 per share, or nearly 8%, to close at $18.93 per share. (*Id.* at 103.)

Plaintiff alleges that on January 9, 2014, the company issued a press release stating that "the Company identified errors in the reconciliation of the Company's subsidiary INTL FCStone Markets, LLC's accounting records to its back office system which occurred in 2012, 2011, and 2010. These corrections resulted in a reduction in net income of $5.9 million for the years ended September 30, 2012, 2011, and 2010 in aggregate, from $57.7 million as reported to $51.8 million". (*Id.* at ¶ 104.) On a conference call that same day, plaintiffs allege that Defendants stated: "These errors occurred in one subsidiary and related to the July 2010 acquisition and the subsequent integration of the Hanley swaps business. During the same period, we more than doubled our transactional volumes on this business and saw a dramatic ramp-up of revenues which exacerbated the situation. ... The errors that occurred during the integration process were masked by a deficient reconciliation process that has also now been corrected. ... In summary, the cumulative effect was less than 2% of our consolidated shareholder fund and around 9% of the aggregate earnings over the period, both GAAP and in adjusted form. While these may not seem to be material in the aggregate over the period, they were considered material in certain individual prior periods." (*Id.* at ¶ 105.)

On January 15, 2014, Plaintiff alleges that Defendant filed their 2013 annual report, which stated: "Management identified a material weakness in internal control over financial reporting that existed as of September 30, 2013, related to the accurate and timely accounting for certain principal over-the-counter derivative trading activities. Specifically,

controls over the reconciliation between trading system data and the general ledger were not designed and operating effectively to timely detect errors in recording trading gains to the general ledger. As a result of this material weakness, we misstated certain principal over-the-counter derivative trading activities during the reporting periods of October 1, 2010 through September 30, 2013. Our corrections related to these errors in aggregate resulted in a reduction in net income of $5.9 million collectively for the years ended September 30, 2012, 2011, and 2010." (*Id.* at ¶ 108.)

The initial complaint in this action already had been filed, two days prior to this disclosure, on January 13, 2014. (Dkt. No. 1.)

## II. LEGAL STANDARD.

### A. MOTION TO DISMISS STANDARD

A motion to dismiss should be granted if the complaint "fails to state a claim upon which relief can be granted." Fed .R. Civ. P. 12(b)(6). The complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* (internal punctuation omitted); *see also* Fed. R. Civ. P. 8(a)(2). The court accepts the non-moving party's factual allegations as true and draws all reasonable inferences in its favor. *Ruotolo v. City of N.Y.*, 514 F.3d 184, 188 (2d Cir. 2008).

### B. SECTION 10(B) AND RULE 10B-5 STANDARDS

Claims for violations of Section 10(b) of the Securities Exchange Act, and the associated Rule 10b–5, sound in fraud, and therefore Plaintiff's allegations must meet the requirements of Rule 9(b) of the Federal Rules for Civil Procedure as well as the Private

8

Securities Litigation Reform Act ("PSLRA"). *See Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). Therefore, in order to survive a Rule 12(b)(6) motion to dismiss under *Twombly* and *Iqbal*, plaintiffs must provide sufficient particularity in their allegations to support a plausible inference that it is more likely than not that a securities law violation has been committed. *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). For claims of securities fraud under Section 10(b) and Rule 10b–5, plaintiffs must adequately allege each of the following elements: (1) that the defendants either made one or more misstatements of material fact, or omitted to state a material fact that the defendants had a duty to disclose (2) with scienter (3) in connection with the purchase or sale of securities; (4) that one or more plaintiffs relied upon the misstatement or omission; and (5) that such reliance was the proximate cause of a plaintiffs' loss (loss causation). *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005); *In re IBM Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998). Plaintiffs must plead with particularity not only which statement(s) were fraudulent, but also when and where the statements were made, why the statements were fraudulent, and the maker of the statement. *See* 15 U.S.C. § 78u–4(b)(1); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

### 1. Falsity.

A violation of Section 10(b) and Rule 10b–5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made. *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812– 13 (2d Cir. 1996) (explaining that "plaintiffs have not alleged circumstances to show that the defendants lacked a reasonable basis for their optimistic, but qualified predictions as to the

9

company's future performance"). A statement believed to be true when made, but later shown to be false, is insufficient. *Id.* In such a circumstance, there is a lack of actionable falsity. As Judge Forrest explained in a recent decision of this Court: "Put another way, without *contemporaneous* falsity, there can be no fraud." *In re lululemon Securities Litigation*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (emphasis in original).

It is not sufficient in a complaint to simply assert that a statement is false—"they must demonstrate with specificity why that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (emphasis added); *accord Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152–53 (2d Cir. 2013). Where a plaintiff asserts the falsity of a statement of belief or opinion, the plaintiff must sufficiently plead that it "was both objectively false and disbelieved by the defendant at the time it was expressed." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011); see City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp., 679 F.3d 64, 67–68 (2d Cir. 2012) (stating that Fait's "reasoning applies under Sections 10(b) and 20(a) of the 1934 Act").

As with alleged misstatements, omissions are only actionable if a defendant is under a duty to disclose information and fails to do so. *See Levitt v. J.P. Morgan Sec.*, Inc., 710 F.3d 454, 465 (2d Cir. 2013). "Silence, absent a duty to disclose, is not misleading under Rule 10b–5." *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n. 17 (1988).

A duty to disclose under Rule 10b–5 may arise either "(1) expressly pursuant to an independent statute or regulation; or (2) as a result of the ongoing duty to avoid rendering existing statements misleading by failing to disclose material facts." *Thesling v. Bioenvision, Inc.*, 374 Fed.Appx. 141, 143 (2d Cir. 2010) (citing 17 C.F.R. § 240.10b–5(b)). Section "10(b) and Rule 10b–5 do not create an affirmative duty to disclose any and all material information." *Kleinman*, 706 F.3d at 152 (citing Matrixx Initiatives, Inc. v. Siracusano, 131 S.Ct. 1309, 1321,

10

(2011)). Disclosure is not required simply because an investor might find the information relevant or of interest. *Kleinman*, 706 F.3d at 153 (citing *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002)).

### 2. Materiality.

Additionally, to be actionable under Section 10(b) and Rule 10b–5, the alleged misstatement or omission must be material. *Basic*, 485 U.S. at 238. That is, there must be a substantial likelihood that a reasonable person would consider the fact misstated or omitted important in connection with a contemplated securities transaction. *Id.*; *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 518 (2d Cir.1994); *In re eSpeed, Inc. Sec. Litig.*, 457 F.Supp.2d 266, 279 (S.D.N.Y. 2006).

Material facts are those that may affect the desire of investors to buy, sell, or hold securities. *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir. 2001). As the Supreme Court has stated, "[t]he question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976).

"[R]osy predictions," or statements that are loosely optimistic regarding a company's well-being, have been found to be too vague and general to be actionable. *See, e.g. Novak*, 216 F.3d at 315 ("statements containing simple economic projections, expressions of optimism, and other puffery are insufficient"); *see also Rombach*, 355 F.3d at 174 (unfocused expressions of puffery and corporate optimism not actionable). Such statements, or "puffery," are not actionable because they are "too general to cause a reasonable investor to rely upon them." *See, e.g., ECA*, 553 F.3d at 206 (general statements regarding a reputation for integrity and highly disciplined risk-management processes constituted non-actionable puffery); *Lasker v.*

11

*New York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir. 1996) (holding statements that company would not "compromise its financial integrity," touting its "commitment to create earnings opportunities," and that these "business strategies [would] lead to continued prosperity," "consist of precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable.").

### 3. Scienter.

Another required element a plaintiff must prove in a securities fraud case is scienter, which is the mental state embracing an intent to deceive, manipulate, or defraud by the maker of a statement. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 323 (2007). When deciding a motion pursuant to Rule 12(b)(6), a court must decide whether all facts taken together—that is, collectively—give rise to a strong inference that a maker of a statement acted with scienter. *Id.* at 323. A plaintiff adequately alleges scienter "only if a reasonable person would deem the inference of scienter *cogent and at least as compelling as any opposing inference one could draw from the facts alleged*." Id. at 324 (emphasis added). Allegations in a complaint regarding scienter, including allegations about the knowledge defendants had or should have had, must be viewed together. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 197–98 (S.D.N.Y. 2010) (citing *Tellabs*, 551 U.S. at 323).

Facts giving rise to a strong inference of scienter can be alleged by (1) pleading the motive and opportunity of the maker of a statement to commit the fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001); *accord Novak*, 216 F.3d at 311. Motive and opportunity require plausible allegations that the maker of a statement could, and had the likely prospect of, realizing concrete benefits by the misstatement. *See Shields*, 25 F.3d at 1130. Allegations limited to the

12

type of "corporate profit" motive possessed by most corporate directors and officers do not suffice. *See Kalnit*, 264 F.3d at 139. "[T]he 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit." *ECA*, 553 F.3d at 198.

Assertions of conscious misbehavior or recklessness can also satisfy the scienter requirement of Section 10(b) and Rule 10b–5. Where a plaintiff fails to plead motive, its allegations regarding conscious misbehavior or recklessness "must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (internal quotation marks and citation omitted); *see also In re Magnum Hunter Resources Corp. Securities Litigation*, 2015 WL 3852561 (2d Cir. June 23, 2015). Recklessness requires allegations that a defendant's conduct was "highly unreasonable" and constituted "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009); *see also Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000); *Novak*, 216 F.3d at 308; *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (recklessness can be found in instances of "[e]gregious refusal to see the obvious, or to investigate the doubtful").

"Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309. "An allegation that a defendant merely ought to have known is not sufficient to allege recklessness." *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 184 (S.D.N.Y. 2012). Allegations of corporate mismanagement, however, are not actionable. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477–79 (1977); *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 376 (S.D.N.Y. 2004) ("allegations of garden-variety mismanagement are

not actionable under section 10(b)") (internal quotation marks and citation omitted), *aff'd sub nom. Albert Fadem Trust v. Citigroup, Inc.*, 165 Fed.Appx. 928 (2d Cir. 2006).

### 4. Section 20(a) Liability.

Section 20(a) of the 1934 Act imposes liability on "control persons." Section 20(a) provides: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). To sustain a claim of control person liability under Section 20(a), Plaintiffs must prove by a preponderance of the credible evidence that (1) there was a primary violation by a controlled person, (2) the "controlling" defendant controlled the primary violator, and (3) the defendant who is alleged to be the controlling person was, in some sense, a culpable participant in the controlled person's fraud. *See ATSI*, 493 F.3d at 108. Courts in the Second Circuit have found that a primary violation combined with a sufficient level of control constitutes culpable participation. *See, e.g., SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) ("plaintiff must show a primary violation by the controlled person and control of the primary violator by the targeted defendant"); *In re Refco, Inc. Sec. Litig.*, 503 F.Supp.2d 611, 660 (S.D.N.Y. 2007); *In re Alstom SA*, 406 F.Supp.2d 433, 487 (S.D.N.Y. 2005).

### III. DISCUSSION

Plaintiff alleges that Defendants collectively, and defendants O'Connor and Dunaway individually, misled investors by making repeated misstatements about the financial status of the company and the success of the integration of the newly-acquired subsidiaries,

14

including Hanley. I find that the Amended Complaint fails to adequately allege that the entirety of false or misleading statements was made under circumstances giving rise to a strong inference of scienter.

### A. Falsity.

The misstatements made by Defendants were in financial disclosures required to be made quarterly and annually during the class period, between December 15, 2010, and December 16, 2013, along with associated press releases and statements made by O'Connor on an investor call. In light of the restatement of Defendants' financials, the allegations of falsity are sufficient to survive this motion to dismiss. *See, e.g., In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004).[1]

### B. Materiality.

Plaintiff adequately pleads that the statements were material. As the company's Form 10-K for the year ending in September 30, 2013, which was filed on January 15, 2014, stated: "Management identified a material weakness in internal control over financial reporting that existed as of September 30, 2013, related to the accurate and timely accounting for certain principal over-the-counter derivative trading activities. Specifically, controls over the reconciliation between trading system data and the general ledger were not designed and operating effectively to timely detect errors in recording trading gains to the general ledger. As a result of this material weakness, we misstated certain principal over-the-counter derivative trading activities during the reporting periods of October 1, 2010 through September 30, 2013.

---

[1] I do not at this point distinguish among statements. For example, whether the statement attributed to O'Connor, "we have pretty quickly overwhelmed both of those businesses. They put up their hands early on and said, enough already, let us deal with what we've got on our plates. The problem there a little bit is not so much of integration, but of capacity" (SAC at ¶ 60), is of a character to be a misstatement, or whether O'Connor knew at the time that his statements were false. *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011); *see also City of Omaha, Neb. Civilian Emps.' Ret. Sys v. CBS Corp.*, 679 F.3d 64, 67-68 (2d Cir. 2012).

15

Our corrections related to these errors in aggregate resulted in a reduction in net income of $5.9 million collectively for the years ended September 30, 2012, 2011, and 2010." (SAC at ¶ 108.) Allegations of acknowledged material weakness in the internal control over financial reporting, as well as the restatement of financial statements for the years ending in September 30, 2010, 2011, 2012, and each of the quarters in the fiscal year ending in September 30, 2012, are sufficient to meet the pleading requirements for materiality.

### C.     Scienter.

The Second Amended Complaint does not meet the heightened pleading standard required by Fed. R. Civ. P. 9(b) and the PSLRA to give rise to a "strong inference" of scienter. *Tellabs,* 551 U.S. at 323. However, I have a certain misgiving in so holding. The Individual Defendants—the Chief Executive Officer O'Connor, and the Chief Financial Officer Dunaway—undoubtedly examined the financial reporting system of Hanley, and undoubtedly knew that it differed materially from the system employed by INTL FCStone. Glitches and difficulties of reconciliations could have been expected, perhaps to a substantial degree, and they did happen, exacerbated in their effects by rapid growth of business. A case of negligence might well be found.

But the law requires more. Not negligence, but recklessness is required, and the facts, as alleged, do not plausibly show negligence. *See Kalnit*, 264 F.3d at 138. The restatement states only that "controls over the reconciliation between trading system data and the general ledger were not designed and operating effectively to timely detect errors in recording trading gains to the general ledger" (SAC at ¶ 108), and this hardly is sufficient plausibly to allege scienter according to a heightened pleading standard.

16

In an age before the PSLRA and the holdings of the Second Circuit in *O'Brien v. National Property Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) and *In re Time Warner Inc. Secs. Lit.*, 9 F.3d 259, 268-269 (2d Cir. 1993), the Defendants' states of knowledge might have passed the bar, even under Fed. R. Civ. P. 9(b). But such allegations no longer suffice. *See Tellabs*, 551 U.S. at 323.

With respect to motive and opportunity, Plaintiff alleges only that Defendants were "motivated to inflate the Company's net income and [earnings per share] in order to beat analysts' earnings estimates". (SAC at ¶ 122.) As the Second Circuit has repeatedly held, "plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud. Insufficient motives, we have held, can include (1) the desire for the corporation to appear profitable ...". *Kalnit*, 264 F.3d at 139 (citing *Novak*, 216 F.3d at 307).

Plaintiff similarly fails on allegations of conscious misbehavior or recklessness. Plaintiff alleges that Defendants ignored the following 'red flags': "(1) the Hanley business was overwhelmed to the point that the Hanley personnel could not handle the roll-out of its capabilities to the Company's 8,000 commercial customers; (2) the transformational FCStone merger had just been completed; (3) additional key acquisitions were completed in the span of just twelve months; (4) the Company's customer count nearly doubled; (5) the Company engaged in a geographic expansion to South America, Europe and Asia; (6) the Company's employee headcount increased by 59%; and (7) the Company's growth was expedited far in excess of what they had originally planned". (SAC at ¶ 119.)

These alleged red flags are nothing more than the growth of an expanding company, and do not create an inference of intent to deceive, manipulate, or defraud that is

17

cogent and at least as compelling as any opposing inference once could draw from the facts alleged. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, 323 (2007).

Defendants also blankly assert, without any identification of the alleged underlying information, that: "Defendants – by virtue of their *receipt of information reflecting the true facts* regarding INTL FCStone, their control over, and/or receipt and/or modification of INTL FCStone's allegedly materially misleading misstatements – were active and culpable participants in the fraudulent scheme alleged herein." (SAC at ¶ 123 (emphasis added).) As the Federal Rules of Civil Procedure, the PSLRA, and case law, all of which I must apply, make clear, a complaint alleging securities fraud will not survive a motion to dismiss without pleading "*with particularity* facts giving rise to a *strong* inference that the defendant acted with the required state of mind." *ECA*, 553 F.3d at 198 (citing 15 U.S.C. § 78u-4(b)(2)) (emphasis added). "Where plaintiffs contend defendants had access to contrary facts, they must *specifically identify* the reports or statements containing this information." *Novak*, 216 F.3d at 309 (emphasis added). Plaintiff's inability to provide any specific information that would contain contrary facts is fatal to its claims.

Another case involving claims of securities fraud which was dismissed for failure to adequately plead scienter which was decided by this Court, *City of Brockton Retirement System v. Shaw Group Inc.*, 540 F. Supp. 2d 464 (S.D.N.Y. 2008) is instructive. In that case, the plaintiffs alleged that the conscious misbehavior or recklessness prong was satisfied by "a confluence of five things: (1) the restatement of 2000 earnings and the disclosure of the failure of accounting controls that led to that restatement; (2) the fact that defendants were "hands on" executives who, as a result of their positions and management styles, either (i) had to know that the company's accounting controls were flawed and that earnings were overstated as a result, or

(ii) were in a position to have that information by virtue of their access to internal company documents; (3) the widespread knowledge of problems with the company's accounting staff, as attested by confidential witnesses; (4) the post-class period disclosure of additional accounting control problems; and (5) the resignation of E & Y as Shaw's outside auditor." *Id.* at 472. In the instant case, only the first two of the above-listed factors are even alleged, and are not sufficient to survive Defendants' motion to dismiss.

### D. Section 20(a) Control Liability.

As the SAC does not sufficiently allege a primary violation of Section 10(b) of the Securities Exchange Act, which is a required predecessor for a finding of Section 20(a) control liability, Plaintiff's claim for Section 20(a) control liability also fails. *See ATSI*, 493 F.3d at 108.

### IV. CONCLUSION

Defendants' motion is hereby GRANTED and Plaintiff's Second Amended Complaint is dismissed. Since Plaintiff now has had two opportunities to allege legally sufficient claims for relief, and twice has failed to do so, this dismissal is with prejudice, without leave to replead.

The Clerk shall mark all open motions terminated, enter judgment for Defendants, and mark the case closed.

SO ORDERED.

Dated: July 13, 2015
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge